# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| WILLIAM T. QUINN and DAVID CROSS,<br><br>      Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,<br><br>      Defendant. | Civil Action No. 24-cv-04364-SCJ |

## BLACK VOTERS MATTER FUND'S BRIEF IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANT

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................4

I.      Georgia's list maintenance obligations under the NVRA ............................4

II.     Plaintiffs' lawsuit................................................................7

III.    Proposed Intervenor Black Voters Matter Fund.................................8

ARGUMENT .......................................................................................11

I.      BVMF is entitled to intervene as a matter of right.........................................11

        A.      The motion to intervene is timely. .....................................11

        B.      The disposition of this case may impair BVMF's ability to protect its
                interests....................................................................................12

        C.      BVMF's interests are not adequately represented by the existing
                parties. ...................................................................................15

II.     The Court should alternatively grant BVMF permissive intervention under
        Rule 24(b). ...................................................................................17

CONCLUSION....................................................................................18

## INTRODUCTION

The National Voter Registration Act ("NVRA") advances several goals. Congress sought to increase the number of eligible citizens who register to vote and to enhance voter participation in elections for federal office while also maintaining accurate and current voter rolls. As a result, the NVRA strikes a delicate balance between its voter engagement and list maintenance goals. It prescribes certain list maintenance procedures and baselines, but also imposes strict guardrails to prevent undue or erroneous purges and outright disenfranchisement of eligible, registered voters—particularly in the final months before an election. Georgia law similarly prescribes specific procedures and time frames for the Secretary of State and county officials to maintain the state's voter rolls.

Yet, with just days to go before voters begin casting ballots in the November 2024 election, Plaintiffs seek to weaponize the NVRA and corresponding provisions of state law to micromanage the State's list maintenance and force the Secretary to undertake brand-new mass purges. Based entirely on allegations that Plaintiffs have themselves identified thousands of purportedly ineligible voters by personally matching unverified national change-of-address ("NCOA") information with a concededly outdated voter registration list, the Complaint declares that the Secretary is in violation of a duty under the NVRA to conduct a program that makes a "reasonable effort" to remove ineligible voters, 52 U.S.C.A. § 20507(a)(4)(B), and

that some voters remain on the State's "official list" of active voters in violation of state law, O.G.C.A. § 21-2-233.

For relief, Plaintiffs demand an extraordinary order compelling the Secretary to instruct county officials to mail notices to voters whom Plaintiffs believe may have moved, and to move their registrations en masse from the "active" list to the "inactive" list "prior to the November 2024 election." Far from bringing Georgia into compliance with list maintenance requirements, such extreme relief would violate rudimentary principles of federal and state law and disregard clearly applicable safeguards for Georgia voters. Indeed, it should hardly be controversial that there is "too little time remaining before the beginning of the 2024 General Election" for courts to order changes to voters' registrations. *Richer v. Fontes*, No. CV-24-0221-SA, 2024 WL 4299099, at *3 (Ariz. Sept. 20, 2024) (rejecting emergency request from county official to alter registrations based on voters' alleged lack of documentation).

Proposed Intervenor BVMF seeks to protect the fundamental voting rights of its constituents—who are among the voters most at risk from Plaintiffs' eleventh-hour demands—as well as its own organizational interests, which would be impeded if Plaintiffs succeed in forcing baseless alterations to Georgia's voter rolls just as voting begins. BVMF is entitled to intervene as a matter of right under Federal Rule of Civil Procedure 24(a) because this lawsuit threatens to impair its interests as a

practical matter and no existing party adequately represents those interests. BVMF's core mission includes securing its constituents' ability to exercise their right to vote, and the organization invests significant resources in conducting its voter registration, education, and assistance activities to advance that mission. For the 2024 election cycle, BVMF committed millions of dollars to programs that helped BVMF's constituents register to vote in Georgia ahead of the October 7 deadline, as well as ongoing programs aimed at turning out and educating voters. If Plaintiffs' relief is granted, BVMF would have to divert scarce resources during these critical final weeks of the election to identify voters at risk of wrongful removal—voters who likely include at least some constituents who registered to vote with the help of BVMF's core activities—and help those voters avoid removal from the active voter list or restore their rightful status on it.

The Secretary plainly does not adequately represent BVMF's interests. He represents the interests of the government—and the competing obligations that come with responding to constituents with different views on how the relevant laws should be enforced—and is necessarily cabined by his statutory obligations to carry out list-maintenance protocols. In fact, BVMF previously sued the Secretary over list maintenance practices that harmed BVMF's constituents and its organizational mission—and in that case, this Court recognized (based on BVMF's evidence) that reliance on NCOA data can erroneously identify eligible voters for removal from

registration lists. *See Black Voters Matter Fund v. Raffensperger*, 508 F. Supp. 3d 1283, 1298 (N.D. Ga. 2020) ("*BVMF*").

Because BVMF satisfies each requirement for intervention as a matter of right under Federal Rule of Civil Procedure 24(a), the motion to intervene should be granted. Alternatively, the motion should be granted on a permissive basis under Rule 24(b).

## BACKGROUND

### I.   Georgia's list maintenance obligations under the NVRA

The NVRA requires states to provide simplified, voter-friendly systems for registering to vote. It establishes procedures designed to "increase the number of eligible citizens who register to vote" and also seeks to make it "possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters." 52 U.S.C. § 20501(b)(1)–(2). Congress enacted these measures in part because it found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." *Id.* § 20501(a)(3).

To further Congress's pro-voter objectives, the NVRA imposes strict restrictions on whether, when, and how a state may remove a voter from its registration rolls. *See* 52 U.S.C. § 20507(a)(3)–(4), (b)–(d). Immediate removal is

permitted only in narrow circumstances, such as when a voter requests to be deregistered or is convicted of a disenfranchising felony. *See id.* § 20507(a)(3)(A)–(B). Otherwise, a state may not remove voters from the rolls without first complying with prescribed procedural safeguards that Congress imposed to minimize risks of erroneous deregistration. *See id.* § 20507(a)(3)(C), (c), (d). For instance, in most cases a registrant may be removed from the rolls because of a change in residence only after failing to respond to a mailed notice *and* failing to appear to vote for two general elections after that notice. *Id.* § 20507(d)(1). The NVRA also prohibits "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" within 90 days of any federal election. *Id.* § 20507(c)(2)(A).

Considering these protections, courts have recognized that the NVRA "does not require states to immediately remove every voter who may have become ineligible." *Pub. Int. Legal Found. v. Benson*, No. 1:21-CV-929, 2024 WL 1128565, at *11 (W.D. Mich. Mar. 1, 2024) ("*PILF*"). Rather, Congress prioritized accuracy over speed and emphasized caution when removing voters to minimize the risk that qualified registrants will be disenfranchised. *See, e.g.*, *Bellitto v. Snipes*, 935 F.3d 1192, 1198–99 (11th Cir. 2019) (discussing the "balance" that Congress "crafted" in enacting the NVRA's list maintenance provisions).

Consistent with this understanding, the NVRA requires that each state make "a *reasonable* effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . death of the registrant" or a "change in the residence of the registrant." 52 U.S.C. § 20507(a)(4)(A), (B) (emphasis added). In other words, "Congress did not establish a specific program for states to follow for removing ineligible voters," *PILF*, 2024 WL 1128565 at *10, nor did it demand perfection; it required only "reasonable" list maintenance efforts—and only in response to a registrants' death or change of residence, *Bellitto*, 935 F.3d at 1195. The NVRA also includes a safe-harbor: states may meet this baseline requirement with respect to voters who have changed residences by establishing a program that uses "change-of-address information supplied by the Postal Service through its licensees" and following the notice procedure described above before initiating any removal procedures. *See* 52 U.S.C. § 20507(c)(1).

Georgia in turn has enacted guidelines that govern the registration of voters and maintenance of the state's voter rolls. *See generally* O.C.G.A. §§ 21-2-210 *et seq.* As relevant here, the Secretary may "at his . . . discretion" compare the "official list of electors" to NCOA information "supplied by the United States Postal Service through its licensees periodically for the purpose of identifying those electors whose addresses have changed." *Id.* § 21-2-233(a). When this NCOA information shows that a voter has moved outside of their county of registration, county officials send

a notice to the voter's old address and, if the voter does not respond within 30 days, move the registration from the "active" list to the "inactive" list. *Id.* § 21-2-233(c). The voter's registration will be cancelled if the voter fails to vote or update their registration for two election cycles thereafter. *See id.* § 21-2-235. This Court has concluded that adherence to these procedures likely satisfies the state's obligation to make a "reasonable effort" to remove ineligible voters under the NVRA's safe harbor provision. *See BVMF*, 508 F. Supp. 3d at 1296.

In February 2024, the Secretary announced that nearly 200,000 voters' registrations had been cancelled based on this list maintenance process in preparation for the 2024 elections, and that tens of thousands more voters' registrations were moved to "inactive" status based on NCOA information.[1]

## II.    Plaintiffs' lawsuit

Plaintiffs are residents of Suwanee, Georgia, who allege that they have personally identified "thousands" of active voters who may have moved by matching a voter registration list purchased from the state on June 30, 2024, to NCOA databases on some unspecified date thereafter. Compl. ¶¶ 3, 4, 20–24. Based solely on the fact that these voters are still on the active voter rolls, Plaintiffs allege that the

---

[1] Press Release, Ga. Sec'y of State, *Georgia's Historic Voter List Maintenance Serves as a National Model for Election Integrity* (Feb. 6, 2024), https://sos.ga.gov/news/georgias-historic-voter-list-maintenance-serves-national-model-election-integrity. (last accessed Oct. 10, 2024).

Secretary has failed to make a "reasonable effort" to maintain the state's voter rolls, 52 U.S.C. § 20507(a)(4), and is thus violating state law, which outlines a "discretion[ary]" maintenance procedure for voters who may have moved, O.C.G.A. § 21-2-233; Compl. ¶¶ 27, 42–50.

Plaintiffs claim that these alleged violations have eroded their trust in Georgia's elections and risk diluting their votes. Compl. ¶¶ 2, 28, 45, 50. They ask the Court to remedy these alleged harms by ordering the Secretary to direct county officials to send notices to the "thousands" of voters whose registrations Plaintiffs believe may be "invalid," and "immediately transfer" them "to Georgia's inactive voter registration list" if they fail to respond—and to "do so prior to the November 2024 election." *Id.* at 17 (Prayer for Relief).

## III.   Proposed Intervenor Black Voters Matter Fund

BVMF is a nonpartisan, nonprofit 501(c)(4) civic organization based in Fulton County whose mission is to increase voting power in communities of color. BVMF invests significant resources serving its core constituency—communities of color who have long been plagued by barriers to voting and civic participation. BVMF's core programs include voter registration, education, and turnout activities, as well as direct assistance during the registration and voting process.

BVMF has expended, and continues to invest, considerable time and mission-critical resources specifically ensuring that voters in its constituency are registered

to vote, remain registered to vote, and cast ballots that will be counted. *See, e.g.*, *BVMF*, 508 F. Supp. 3d at 1291–92 & n.7 (describing BVMF's efforts in 2020 reaching voters whose registrations were "erroneously cancelled" based on NCOA data to combat harm to its "core mission"). Ahead of the 2024 election, BVMF has invested roughly $5 million in programs aimed at registering and turning out voters throughout the nation, including in Georgia. The investments include various events focused on registering and educating voters, social media and advertising campaigns about opportunities to register to vote, as well as direct outreach to Georgia voters to encourage participation and assist with the registration process. They also include trainings for BVMF's supporters, volunteers, and partner organizations who provide assistance to voters. BVMF has further provided substantial grants to partner organizations who have hosted registration events and continue to work to engage and turn out voters in BVMF's core constituency ahead of November 5.

Because Plaintiffs seek relief that would potentially remove "thousands" of voters from the "official list" of "active voters" and place them on the "inactive" voter list based on their alleged use of unverified NCOA data, *supra* Background § I, BVMF has strong reason to fear that voters in its core constituency—including at least some voters who registered to vote with the help of BVMF initiatives, or even voters within BVMF's network of supporters and volunteers—are among those who will be erroneously identified as having moved. While Plaintiffs' Complaint is

vague about the voters they have identified, it specifies that "over three thousand" are in Fulton County—home to the state's largest Black population and where the bulk of Proposed Intervenor's core constituency resides. *See* Compl. ¶ 27. Moreover, BVMF's constituents—who are largely young, Black, and often come from low-income backgrounds—are disproportionately likely to lack a permanent residential mailing address and/or move back and forth between addresses, placing them at an elevated risk of being erroneously identified in Plaintiffs' program.

When such voters are removed from Georgia's official active voter list and placed on the inactive voter list, BVMF's mission of maximum voter registration and participation is frustrated. While Plaintiffs seem to emphasize that "inactive voters" can still vote on Election Day, they admit that such voters must take unnecessary steps just to remain on the state's official voter list, Compl. ¶ 2, and entirely ignore that eleventh-hour changes to a voter's registration status can discourage participation, causing wrongful disenfranchisement.[2] To combat these risks, which threaten to undermine BVMF's core activities, BVMF will be forced to expend its scarce resources and time identifying and contacting voters who are swept

---

[2] *E.g.*, Press Release, *DeKalb Voter Registration and Elections Urges Residents to Verify Voter Status and Plan for Upcoming Election*, DeKalb. Co. (Sept. 5, 2024), available at perma.cc/4AAU-E4UC (explaining that "seeing an 'inactive' voter registration status" that resulted from an erroneous removal "can be confusing and alarming," and that it is necessary to ensure such voters are informed they can still vote).

up in Plaintiffs' purges to educate and assist them with maintaining or restoring their rightful inclusion on the official active voter list—just so that they can cast their ballots without needless roadblocks.

## ARGUMENT

### I.      BVMF is entitled to intervene as a matter of right.

Under Rule 24(a)(2), this Court "must allow" intervention as of right if: (1) the motion is timely; (2) movants have a legally protected interest in this action; (3) this action may impair or impede that interest; and (4) no existing party adequately represents Movants' interests. *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989). "[A]ny doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors." *New Georgia Project v. Raffensperger*, No. 1:21-CV-01229-JPB, 2021 WL 2450647, at *2 (N.D. Ga. June 4, 2021) (quoting *Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993)). BVMF easily satisfies these requirements.[3]

### A.      The motion to intervene is timely.

BVMF's motion is timely. Plaintiffs filed their Complaint on September 26, 2024. *See* ECF No. 1. This motion follows just two weeks later, before any

---

[3] Rule 24(c) requires a motion to intervene to "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Should Proposed Intervenor be granted intervention, it requests the Court's permission to file a Motion to Dismiss and accompanying brief in support, attached as Exhibit 2. Should the Court decline to grant Proposed Intervenor's request to file a Motion to Dismiss, a Proposed Answer is attached as Exhibit 1.

significant action has occurred in the case. BVMF is also prepared to comply with any briefing schedules set by the Court and participate in any proceedings without delay. Because this case is in its infancy and there is no possible risk of prejudice to other parties, BVMF's motion to intervene is timely. *See Chiles*, 865 F.2d at 1213.

On the other hand, as detailed below, BVMF would suffer substantial prejudice if its request to intervene is denied because it would be effectively unable to prevent harms to its constituents and organizational mission that would result from Plaintiffs' eleventh-hour request to conduct systematic list maintenance and potentially remove eligible voters from the rolls. *Id.* (recognizing that courts may also weigh "the extent of prejudice to the [proposed intervenors] if their motion is denied" in analyzing timeliness).

## B. The disposition of this case may impair BVMF's ability to protect its interests.

BVMF has significant protectable interests that stand to be impaired by Plaintiffs' suit, satisfying the intertwined second and third elements of Rule 24(a)(2). To be sure, the movant "do[es] not need to establish that [its] interests *will* be impaired . . . only that the disposition of the action 'may' impair or impede [its] ability to protect [its] interests." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014) (emphasis in original). Ultimately, this inquiry is "flexible" and depends on the circumstances surrounding the action. *Chiles*, 865 F.2d at 1214.

Here, BVMF has a strong interest in ensuring that its constituents—at least some of whom are likely among those swept up in Plaintiffs' faulty NCOA data-matching process—remain registered as active voters and successfully participate in the upcoming election. Indeed, courts have granted intervention based on similar interests in NVRA cases seeking to remove registered voters from voter rolls. *Bellitto v. Snipes*, No. 16-cv-61474, 2016 WL 5118568, at *2–3 (S.D. Fla. Sept. 21, 2016); *Jud. Watch, Inc. v. Illinois State Bd. of Elections*, No. 24 C 1867, 2024 WL 3454706, *3 (N.D. Ill. July 18, 2024); *Pub. Int. Legal Found. v. Winfrey*, 463 F. Supp. 3d 795, 799–800, 802 (E.D. Mich. 2020); Order, *Daunt v. Benson*, 1:20-cv-522 (W.D. Mich. Sept. 28, 2020), ECF No. 30 (same); Order, *Voter Integrity Proj. NC, Inc. v. Wake Cnty. Bd. of Elections*, No. 5:16-cv-683 (E.D.N.C. Dec. 1, 2016), ECF No. 26. And as in *Bellitto*, this threatened harm is "particularly great in light of the upcoming . . . General Election." 2016 WL 5118568, at *2.

Given the breadth of Plaintiffs' requested relief—*e.g.*, to potentially remove thousands of Georgia voters from the active voter list, including more than 3,000 in Fulton County alone—this action presents an acute and realistic threat that at least some of the voters who registered with the help of BVMF's voter registration activities, as well as voters in BVMF's network of supporters, volunteers, and staff who carry out BVMF's core initiatives will have their registration status threatened on the eve of the general election. *See supra* Background § I. If these voters are

disenfranchised or forced to navigate additional, unnecessary steps to exercise their right to vote, some of BVMF's mission-critical investments in voter registration and turnout will be undermined or even "nullif[ied]." *BVMF*, 508 F. Supp. 3d at 1291. And to prevent such direct harm to BVMF's core activities, BVMF would be forced to divert its limited resources during the most critical time in the election cycle toward identifying, contacting, educating, and assisting affected voters.

Plaintiffs' purge effort would therefore impair BVMF's activities, mission, and resources, all of which would satisfy even Article III's more demanding standard for standing and is more than sufficient for intervention as of right. *See id.* (holding that BVMF and other groups established standing based on diversion of resources away from other election programs toward efforts to identify and educate voters removed from the rolls based on faulty NCOA data); *see also, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *New Georgia Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1286–87 (N.D. Ga. 2020); *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019).[4]

---

[4] To be sure, the Supreme Court clarified in *FDA v. Alliance for Hippocratic Medicine* that the organizational standing test requires an organization to show that the challenged act "perceptibly impair[s]" "core" activities to demonstrate an injury, 602 U.S. 367, 395 (2024) (explaining the holding of *Havens*, 455 U.S. at 379), but this Court's findings in *BVMF* track that framework, *compare FDA*, 602 U.S. at 395, *with BVMF*, 508 F. Supp. 3d at 1291. There, BVMF and other groups identified

**C.     BVMF's interests are not adequately represented by the existing parties.**

BVMF will not be assured adequate representation in this matter if it is denied

intervention. "The requirement of the Rule is satisfied if the applicant shows that

representation of his interest 'may be' inadequate," and therefore "the burden of

making that showing should be treated as minimal." *Trbovich v. United Mine*

*Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (citing 3B J. Moore, Federal Practice

24.09—1 (4) (1969)); *accord Berger v. N.C. State Conf. of the NAACP*, 597 U.S.

179, 196 (2022); *Chiles*, 865 F.2d at 1214. Accordingly, courts are "liberal in

finding" this requirement to be met because "there is good reason in most cases to

suppose that the applicant is the best judge of the representation of the applicant's

own interests." 7C Charles Alan Wright & Arthur R. Miller, Federal Practice &

Procedure § 1909 (3d ed. 2024). Indeed, the Supreme Court recently cautioned that

courts should not conduct this inquiry at too "high [a] level of abstraction," and

reaffirmed that, even where the parties' interests "seem[] closely aligned," the

burden to demonstrate inadequate representation remains "minimal" unless those

interests are "identical." *Berger*, 597 U.S. at 196. So even if the existing defendants

---

mission-critical "election related programs," explained why such core activities
stood to be frustrated or even "nullif[ied]" by removal of voters from the rolls, and
showed that the groups diverted resources from other activities to combat these
harms to their core activities. *BVMF*, 508 F. Supp. 3d at 1291–92.

oppose the relief Plaintiffs seek, it does not follow that they will adequately represent BVMF's interests.

This is especially true when the defendants are government entities. Because government parties' "views are necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it," courts have regularly found that "the burden [of establishing inadequacy of representation] is comparatively light." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) (citing *Conservation L. Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992), and *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996)); *accord Berger*, 597 U.S. at 196 (explaining that burden remains "minimal" where government party must "bear in mind broader public policy implications"); *see also, e.g.*, *Issa v. Newsom*, 2:20-cv-01044-MCE-CKD, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020); *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365, at *3 (D. Nev. Apr. 28, 2020).

The divergence of interests between government officials and private parties is particularly sharp in actions like this one that seek to identify and remove voters from the rolls. *Bellitto*, 2016 WL 5118568, at *2 (granting intervention as a matter of right to organization in voter purge challenge); *see also Jud. Watch, Inc.*, 2024 WL 3454706, at *4 (similar); *Winfrey*, 463 F. Supp. 3d at 799–800 (granting permissive intervention on this ground). This is because government defendants

must balance competing objectives, including their list maintenance obligations, while groups like BVMF have a more limited focus on protecting their own interests and those of their voters. *Winfrey*, 463 F. Supp. 3d at 800 (citing *Bellitto*, 935 F.3d at 1198).

That is obviously the case here: While BVMF opposes use of error-prone list maintenance practices that burden duly registered voters, the Secretary of State is specifically charged with facilitating some of these acts. *See* O.C.G.A. §§ 21-2-210, 21-2-233. The Secretary of State's office is not institutionally designed to be a zealous advocate for the maximum participation of BVMF's constituents and therefore cannot adequately represent BVMF—whose mission is to do just that. Indeed, that BVMF was forced to sue the Secretary precisely because Georgia's use of NCOA data threatens BVMF's constituents, *supra* at 3, demonstrates, at the very least, that BVMF's interests "may" not be adequately represented by the Secretary. *Trbovich*, 404 U.S. at 538 n.10; *cf. Meek v. Metro. Dade County*, 985 F.2d 1471, 1478 (11th Cir. 1993) ("Any doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors because it allows the court to resolve all related disputes in a single action.").

## II. The Court should alternatively grant BVMF permissive intervention under Rule 24(b).

If the Court does not grant intervention as a matter of right, BVMF requests that the Court exercise its discretion to allow intervention under Rule 24(b). The

Court has discretion to grant a motion for permissive intervention when: (1) the proposed intervenor's claim or defense and the main action have a question of law or fact in common, and (2) the intervention will not unduly delay or prejudice the adjudication of the original parties' rights. *See* Fed. R. Civ. P. 24(b); *Chiles*, 865 F.2d at 1213; *Ga. Aquarium, Inc. v. Pritzker*, 309 F.R.D. 680, 690 (N.D. Ga. 2014). "[T]he claim or defense clause of Rule 24(b)(2) is generally given a liberal construction." *Ga. Aquarium,* 309 F.R.D. at 690.

BVMF easily meets these requirements. First, BVMF will inevitably raise common questions of law and fact because it seeks to oppose the very purges that Plaintiffs seek to compel in this lawsuit. *Supra* Argument § I.B. Second, for the reasons already explained, the motion to intervene is timely, and given the early stage of this litigation, intervention will not delay or prejudice the adjudication of the rights of the original parties. *Supra* Argument § I.A. BVMF is prepared to proceed in accordance with the schedule this Court determines, and its intervention will only serve to contribute to the complete development of the factual and legal issues before the Court.

## CONCLUSION

For these reasons, BVMF respectfully requests that the Court grant its motion to intervene as a matter of right, or in the alternative, to intervene permissively.

Dated: October 10, 2024                    Respectfully submitted,

**/s/ Adam M. Sparks**
Adam M. Sparks
Ga. Bar No. 341578
Anré D. Washington
Ga. Bar No. 351623
**KREVOLIN & HORST, LLC**
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: sparks@khlawfirm.com
Email: washington@khlawfirm.com

Uzoma N. Nkwonta*
Justin Baxenberg*
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue, Suite 400
Washington, D.C. 20001
(202) 968-4490
unkwonta@elias.law
jbaxenberg@elias.law
mmcqueen@elias.law

Tyler L. Bishop*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(202) 985-0628
tbishop@elias.law

*Counsel for Proposed Intervenor-Defendant BVMF*

*\*Pro Hac Vice Application Forthcoming*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, NDGa, the undersigned counsel hereby certifies that the foregoing document complies with the font and point selections approved by the Court in Local Rule 5.1C, NDGa. This document was prepared on a computer using Times New Roman font (14 point).

This 10th day of October 2024.

<u>**/s/ Adam M. Sparks**</u>
Adam M. Sparks
*Counsel for Proposed*
*Intervenor-Defendant BVMF*