**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| WILLIAM T. QUINN and DAVID CROSS,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,<br><br>Defendant. | Civil Action No. 24-cv-04364-SCJ |

**BLACK VOTERS MATTER FUND'S MOTION TO DISMISS**

COMES NOW BLACK VOTERS MATTER FUND, by and through its undersigned counsel of record, and files this Proposed Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

The basis for the motion is more fully set forth in Black Voters Matter Fund's accompanying Brief in Support of Motion to Dismiss.

Dated: October 10, 2024        Respectfully submitted,

**/s/ Adam M. Sparks**
Adam M. Sparks (Ga. Bar No. 341578)
Anré D. Washington (Ga. Bar No. 351623)
**KREVOLIN & HORST, LLC**
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250

**Exhibit 2**

Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: sparks@khlawfirm.com
Email: washington@khlawfirm.com

Uzoma N. Nkwonta*
Justin Baxenberg*
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
jbaxenburg@elias.law
mmcqueen@elias.law

Tyler L. Bishop*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(202) 985-0628
tbishop@elias.law

*Counsel for Proposed Intervenor-Defendant Black Voters Matter Fund*

*\*Pro Hac Vice Application Forthcoming*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WILLIAM T. QUINN and DAVID CROSS,

     Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,

     Defendant.

Civil Action No. 24-cv-04364-SCJ

# BLACK VOTERS MATTER FUND'S BRIEF IN SUPPORT OF MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

BACKGROUND ..................................................................................2

ARGUMENT .......................................................................................5

I.      This Court lacks jurisdiction over Plaintiffs' claims. ....................................5

        A.      Plaintiffs lack Article III standing. ........................................................6

        B.      This Court lacks subject matter jurisdiction to hear Plaintiffs'
                state law claim. .......................................................................11

II.     Plaintiffs fail to state a claim. ........................................................12

        A.      Plaintiffs' requested relief is barred by the NVRA's pre-election
                list-maintenance quiet period. ............................................................13

        B.      Plaintiffs fail to state a claim under the NVRA. .................................15

        C.      Plaintiffs fail to state a claim under state law.....................................18

CONCLUSION .....................................................................................19

# INTRODUCTION

This lawsuit asks the Court to insert itself into Georgia's process for maintaining its list of eligible voters on the eve of an election based on Plaintiffs' voter roll maintenance experiment. Georgia already conducts its own regular voter roll maintenance in which it compares lists of people who have moved, died, or been convicted of a felony with the state's voter rolls and, where appropriate, initiates a federally-regulated removal process. Plaintiffs now ask this Court to replace Georgia's list-maintenance program with their own, allowing Plaintiffs to determine which voters have relocated and how and when election officials must act.

Their reason for demanding this authority is simply that the results of their homemade voter roll project (unsurprisingly) are not identical to those of State and county officials. But Plaintiffs not only fail to put forth any basis for finding Defendants have violated the law, they fail virtually every procedural requirement as well: Plaintiffs lack an injury sufficient to confer Article III standing; they seek a remedy under the National Voter Registration Act ("NVRA") but fail to allege a violation of that statute—in fact, the NVRA explicitly prohibits the remedy Plaintiffs seek; they seek a further remedy under a state law that provides no private right of action; and they do so in a court that would nevertheless lack jurisdiction under the *Pennhurst* doctrine to decide the claim. For all these reasons, Plaintiffs' Complaint should be dismissed.

**BACKGROUND**

The NVRA requires states to provide simplified, voter-friendly systems for registering to vote. It establishes procedures designed to "increase the number of eligible citizens who register to vote" and also seeks to make it "possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters." 52 U.S.C. §§ 20501(b)(1)–(2). Consistent with this understanding, the NVRA requires that each state make "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . death of the registrant" or a "change in the residence of the registrant," 52 U.S.C. §§ 20507(a)(4)(A), (B), but "did not establish a specific program for states to follow for removing ineligible voters," *Pub. Int. Legal Found. v. Benson*, No. 1:21-cv-929, 2024 WL 1128565 at *10 (W.D. Mich. Mar. 1, 2024) ("*PILF*").[1]

To further Congress's pro-voter objectives, the NVRA imposes strict restrictions on whether, when, and how a state may remove a voter from its registration rolls. *See* 52 U.S.C. §§ 20507(a)(3)–(4), (b)–(d). Immediate removal is permitted only in narrow circumstances, such as when a voter requests to be

---

[1] The NVRA also includes a safe-harbor: states may meet this baseline requirement with respect to voters who have changed residences by establishing a program that uses "change-of-address information supplied by the Postal Service through its licensees" and using the notice procedure described below to commence removal procedures as to such voters. *See* 52 U.S.C. § 20507(c)(1).

deregistered or is convicted of a disenfranchising felony. *See id.* §§ 20507(a)(3)(A)–(B). Otherwise, a state may not remove voters from the rolls without first complying with prescribed procedural safeguards that Congress imposed to minimize risks of erroneous deregistration. *See id.* §§ 20507(a)(3)(C), (c), (d). For instance, in most cases a registrant may be removed from the rolls because of a change in residence only after failing to respond to a mailed notice *and* failing to appear to vote for two general elections after that notice. *Id.* § 20507(d)(1). The NVRA also prohibits "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" within 90 days of any federal election. *Id.* § 20507(c)(2)(A) (emphasis added) (the "90-day quiet period").

In accordance with the NVRA, Georgia has enacted procedures to govern the registration of voters and maintenance of the state's voter rolls. *See generally* O.C.G.A. §§ 21-2-210 *et seq.* As relevant here, the Secretary may "at his . . . discretion" compare the "official list of electors" to National Change of Address ("NCOA") information "supplied by the United States Postal Service through its licensees periodically for the purpose of identifying those electors whose addresses have changed." *Id.* § 21-2-233(a). When this NCOA information shows that a voter has moved outside of their county of registration, county officials send a notice to the voter's old address and, if the voter does not respond within 30 days, move the registration from the "active" list to the "inactive" list. *Id.* § 21-2-233(c). The voter's

registration will be cancelled if the voter fails to vote or update their registration for two election cycles thereafter. *See id.* § 21-2-235. This Court has concluded that the use of these procedures likely satisfies the state's obligation to make a "reasonable effort" under the NVRA's safe harbor provision. *See Black Voters Matter Fund v. Raffensperger*, 508 F. Supp. 3d 1283, 1296 (N.D. Ga. 2020). Indeed, it has resulted in substantial numbers of voters being removed from the rolls: in February 2024, the Secretary announced that nearly 200,000 voters' registrations had been cancelled using this process in preparation for the 2024 elections, and that tens of thousands more voters were moved to "inactive" status based on NCOA information.[2]

Plaintiffs William T. Quinn and David Cross are the latest activists in a series of likeminded individuals to come before a court in recent weeks and ask that it interfere with Georgia's voter registration system. *See, e.g.*, *Frazier v. Fulton County Department of Registration and Elections*, No. 1:24-CV-03819-SCJ (N.D. Ga. 2024) (voluntarily dismissed for lack of statutory standing). Quinn and Cross report that they purchased a list of voters from the state on June 30, 2024, and subsequently used the U.S. Postal Service's NCOA database to conduct their own homespun

---

[2] Press Release, Ga. Sec'y of State, *Georgia's Historic Voter List Maintenance Serves as a National Model for Election Integrity* (Feb. 6, 2024), available at https://sos.ga.gov/news/georgias-historic-voter-list-maintenance-serves-national-model-election-integrity (last accessed Oct. 10, 2024).

matching process in an attempt to identify voters they believe have relocated and are no longer eligible to cast ballots where they are registered.

Plaintiffs report that after coming up with a list of voters they believe to be ineligible they sent the Secretary a letter asking that he undertake *ad hoc* list maintenance proceedings by initiating the removal process against these voters.[3] The Secretary did not accede to Plaintiffs' demands and on September 26, 2024, Plaintiffs filed this suit, in which they allege that their matching process identified an unspecified number of voters who had asked the Postal Service to forward their mail and who still appeared on the state's voter rolls. On this basis alone, Plaintiffs allege that the Secretary—and, through him, the state of Georgia—has violated the state's voter roll maintenance statute, O.C.G.A. § 21-2-233, and the NVRA.

## ARGUMENT

### I. This Court lacks jurisdiction over Plaintiffs' claims.

This case should be dismissed because the Court lacks jurisdiction to hear Plaintiffs' claims for at least two independent reasons: First, Plaintiffs have not alleged a cognizable injury-in-fact and thus fail to satisfy Article III's standing requirements. Second, this Court independently lacks jurisdiction over Plaintiffs'

---

[3] Plaintiffs insist that they "did not request the removal or cancellation of any voter's registration," Compl. ¶ 34, but ignore the fact that the mailing of a notice and placement on the list of inactive voters are the initial steps of the removal process.

state law claim because it seeks a federal court order to compel the Secretary to comply with state law in violation of the *Pennhurst* doctrine.

**A. Plaintiffs lack Article III standing.**

To satisfy Article III's standing requirements at the pleading stage, Plaintiffs must allege that they have suffered "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs must establish these elements for each claim for relief that they assert. *E.g.*, *California v. Texas*, 593 U.S. 659, 660 (2021) (explaining that "just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement"); *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) ("Article III's standing requirements apply to state-law claims brought in federal court."). Because Plaintiffs' allegations here are insufficient to support standing, their complaint must be dismissed.

Plaintiffs' threadbare allegations are woefully inadequate even to "allege the 'first and foremost of standing's three elements': an injury in fact." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 338). An injury is "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996-97 (11th Cir. 2020) (each

of these "subsidiary elements" must be satisfied); *Spokeo*, 578 U.S. at 340. Plaintiffs assert two so-called "injuries," neither of which is judicially cognizable.

First, Plaintiffs claim that the current list maintenance regime has "undermined (and will continue to undermine) Plaintiffs' confidence in the electoral process." Compl. ¶ 28. Notwithstanding a few scattered examples, courts have almost "universally concluded that an alleged injury related to a lack of confidence" in election administration "is 'too speculative to establish an injury in fact.'" *Thielman v. Fagan*, No. 3:22-CV-01516-SB, 2023 WL 4267434, at *4 (D. Or. June 29, 2023) (quoting *Lake v. Hobbs*, 623 F. Supp. 3d 1015, 1028–29 (D. Ariz. 2022)), *aff'd sub nom. Thielman v. Griffin-Valade*, No. 23-35452, 2023 WL 8594389 (9th Cir. Dec. 12, 2023) (collecting cases). And *no* federal circuit court has recognized this type of harm as a cognizable injury for Article III purposes. For good reason: if a subjective lack of confidence in governmental "process" is sufficient to invoke federal court jurisdiction, then standing becomes meaningless; any disagreement over policy could be reframed as a lack of confidence in the results.

As the U.S. Supreme Court has now repeatedly explained, concerns that the law "has not been followed" constitute "precisely the kind[s] of undifferentiated, generalized grievance[s] about the conduct of government that [courts] have refused to countenance." *Lance v. Coffman*, 549 U.S. 437, 442 (2007); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[A] citizen does not have standing

to challenge a government regulation simply because the plaintiff believes that the government is acting illegally."); *Wood*, 981 F.3d at 1315.

Second, Plaintiffs' purported vote dilution injury, Compl. ¶¶ 28, 45, 50, has been rejected by a "veritable tsunami" of courts across the country, including in this Circuit. *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742, at *9 (D. Colo. Apr. 28, 2021) (collecting cases), *aff'd*, No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022); *see also Fair Fight, Inc. v. True the Vote, Inc.*, 2:20-cv-0302-SCJ, 2021 WL 12299453, at *6 n.9 (N.D. Ga. Aug. 17, 2021) (recognizing this "theory of vote dilution is based upon a premise that the Eleventh Circuit and other courts have declined to uphold in other contexts on generalized grievance standing grounds"). And, again, no circuit court that has considered the theory has found it sustainable. That is because, as the Eleventh Circuit explained, "no single voter is specifically disadvantaged if a vote is counted improperly, even if the error might have a mathematical impact on the final tally and thus on the proportional effect of every vote." *Wood*, 981 F.3d at 1314–15 (citation omitted). A claimed vote dilution injury is merely a "paradigmatic generalized grievance that cannot support standing." *Id.*

As the cases recognize, Plaintiffs' generalized vote-dilution theory is fundamentally different in kind from a vote-dilution injury in the redistricting context, where the challenged map minimizes a particular voter's or a group's voting

strength *as compared to other voters*. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207–08 (1962); *Wood*, 981 F.3d at 1314 (explaining that vote dilution may be an injury "in the racial gerrymandering and malapportionment contexts" but not where a voter alleges wrongful votes were allegedly counted due to fraud); *accord*, *e.g.*, *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. 2020) ("As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud."). Where the counting of contested ballots would "dilute" the voting power of all voters equally, there is no injury sufficient for Article III standing. *Wood*, 981 F.3d at 1314–15.

But even if the theory were cognizable, the Complaint is devoid of any allegation indicating how Plaintiffs' votes would be diluted merely because the names of the voters they identified appeared on the voter rolls. Submission of a change of address by itself is insufficient to establish that a voter has moved or is no longer properly registered—that is part of the reason why appearance on an NCOA database alone is insufficient to support a challenge to a voter's residence. O.C.G.A. § 21-2-230(b).[4] And, even then, being registered to vote and voting are not the same thing. These logical gaps in Plaintiffs' allegations are independently fatal to

---

[4] Just this year the General Assembly amended the statute to make clear that the mere presence of a name in the NCOA database "shall be insufficient cause to sustain" a challenge to a voter's eligibility. 2024 Ga. Laws Act 697, § 5; O.C.G.A. § 21-2-230(b).

establishing Article III standing. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964 (11th Cir. 2005) ("The plaintiff has the burden to clearly and specifically set forth facts sufficient to satisfy Art. III standing requirements.").

To the extent Plaintiffs intend to allege an injury-in-fact based on a statutory right under Georgia law to have notices mailed and voters removed from the active voter list, Compl. ¶¶ 19, 48–50, such allegations are insufficient as a matter of law. As the Eleventh Circuit has explained, under Article III, "the relevant question is *whether [the plaintiff] was harmed* when th[e alleged] statutory right was violated." *Nicklaw v. Citimortgage, Inc.*, 839 F.3d 998, 1002 (11th Cir. 2016) (emphasis added) (holding that plaintiff lacked standing to assert claims under state law because he did not allege that he sustained a concrete injury); *see also, e.g.*, *Wilding*, 941 F.3d at 1125 (collecting authorities). Here, while Plaintiffs claim violations of their statutory rights under state law, the Complaint lacks any allegations explaining how they are harmed in any concrete or particularized manner. *Lance*, 549 U.S. at 442; *Wood*, 981 F.3d at 1315. The same is true to the extent Plaintiffs allege that they have established an injury-in-fact merely by invoking the NVRA's private right of action. *See* Compl. ¶ 30, 32, 41, 46; *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (dismissing properly noticed claim under NVRA because organization failed to demonstrate injury-in-fact); *cf. Georgia State Conf. of NAACP v. Kemp*, 841 F. Supp.

2d 1320, 1336 (N.D. Ga. 2012) (finding organization had standing to bring properly noticed NVRA claim only after finding it established Article III standing).

Because Plaintiffs have alleged no cognizable injury sufficient to satisfy the demands of Article III as to any of their claims for relief, the Complaint should be dismissed in its entirety.

### B. This Court lacks subject matter jurisdiction to hear Plaintiffs' state law claim.

In addition to failing to establish standing, the *Pennhurst* doctrine prohibits this Court from exercising jurisdiction over Plaintiffs' state law claims. Under that doctrine, federal courts lack jurisdiction over claims seeking to compel state officials to comply with state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984); *Davis v. Jackson*, No. 8:09-CV-1070-T-17, 2010 WL 2836688, at *2 (M.D. Fla. July 19, 2010), *aff'd sub nom. Davis v. Adm'r of U.S. E.P.A.*, 443 F. App'x 394 (11th Cir. 2011); *see also Cummings v. DeSantis*, No. 2:20-CV-351-FTM-38NPM, 2020 WL 4815816, at *2 (M.D. Fla. Aug. 19, 2020) ("[F]ederal courts have no jurisdiction over official-capacity claims against state officials[ ] when those defendants are accused of violating state law and the relief sought will have an impact directly on the state itself."). Count II accuses the Secretary of an alleged violation of O.C.G.A. § 21-2-233 only, and the only affirmative relief sought is "[a] writ of mandamus or an injunction directing Secretary Raffensperger to direct all county registrars to send notices under Ga. Code Ann. § 21-2-233(c)." Compl.

Prayer for Relief ¶ C. As a matter of constitutional law, a federal court cannot order such relief. This provides an independent reason to dismiss Count II.

## II.   Plaintiffs fail to state a claim.

To survive a 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausibility is the key, as the well-pled allegations must nudge the claim across the line from conceivable to plausible." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (internal quotations omitted). "Naked assertions devoid of further factual enhancement" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678 (cleaned up).

Furthermore, to obtain a writ of mandamus under either federal or state law, Plaintiffs must demonstrate, among other things, a clear right to the relief requested and a clear violation by the defendant of a duty to act. *See Alabama v. United States*, 198 F. Supp. 3d 1263, 1275 (N.D. Ala. 2016) (explaining "mandamus relief is only available if the plaintiff has a clear right to the relief requested (in other words, the defendant must have a clear duty to act)" and the plaintiff has "no alternative remedies") (citations omitted); *Bibb Cnty. v. Monroe Cnty.*, 755 S.E.2d 760, 766 (Ga. 2014) (reciting similar standard under Georgia law).

**A. Plaintiffs' requested relief is barred by the NVRA's pre-election list-maintenance quiet period.**

The NVRA imposes strict restrictions on whether, when, and how a state may remove a voter from its registration rolls. *See id.* §§ 20507(a)(3)–(4), (b)–(d). Among those restrictions is a prohibition against systematic voter removal activities within 90 days of any federal election: States must complete "any program the purpose of which is to systematically remove the names of ineligible voters" from the rolls "not later than 90 days prior to the date of a primary or general election for Federal office." *Id.* § 20507(c)(2)(A). That mandate bars Plaintiffs' efforts to compel counties to initiate proceedings to remove voters.

Plaintiffs attempt to evade the 90-day quiet period by stating they "did not request the removal or cancellation of any voter's registration from Georgia's voter lists," but this ignores the plain language of the NVRA. Compl. ¶ 34. The statute does not prohibit only the final step of "removal" during the quiet period: it requires "*any program* the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" to be "completed" before the quiet period. 52 U.S.C. § 20507(c)(2)(A) (emphasis added). The mailing of notices and subsequent reclassification of voters as "inactive" are the integral first steps in Georgia's program for removing voters from the voter rolls. O.C.G.A. § 21-2-233 (stating a voter who does not respond to a mailed notice "shall be transferred to the inactive list"); *see also* O.C.G.A. § 21-2-235 (stating "the elector shall be

removed from the inactive list of electors" after the second November general election following notice).

The Eleventh Circuit has recognized that the NVRA's use of "the phrase 'any program' suggests that [this provision] has a broad meaning," and "strongly suggests that Congress intended the 90 Day Provision to encompass programs of any kind." *Arcia*, 772 F.3d at 1344; *see also United States v. Gonzalez*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"). In *Arcia*, the court explained that a program aims to "systematically" remove names within the scope of the NVRA where it does "not rely upon individualized information or investigation to determine which names from the voter registry to remove," and instead employs "a mass computerized data-matching process to compare the voter rolls with other state and federal databases." 772 F.3d at 1344. This reading of the NVRA as prohibiting the Secretary from acting on Plaintiffs' demands is consistent with the guidance from the U.S. Department of Justice, which has explained that the NVRA quiet period's prohibitions include "general mailings" and "list maintenance programs based on third-party challenges derived from any large, computerized data-matching process."[5]

---

[5] Dep't of Justice, *NVRA List Maintenance Guidance*, available at perma.cc/2KLK-VFTV (last visited Oct. 10, 2024).

Here, Plaintiffs' acknowledged use of "information from the USPS [NCOA] Database" and of "several progressively deeper-leveled databases" makes clear that they relied on a data matching process. Compl. ¶¶ 20–23. And they seek to compel action *pursuant to* Code Section 233, which sets forth Georgia's systematic program for identifying and removing voters who have relocated. But such a request is facially subject to the NVRA's 90-day quiet period, which prohibits the relief Plaintiffs seek.

**B. Plaintiffs fail to state a claim under the NVRA.**

Plaintiffs assert that the Secretary has violated the NVRA because of, they allege, his "failure to correct . . . registrations," but they ignore their own evidence which makes clear that election officials, including the Secretary, have satisfied the NVRA's requirement that they conduct ongoing list maintenance. Plaintiffs themselves point to a press release from the Secretary's office as evidence that the state's program is inadequate but, in fact, it proves the opposite. Compl. ¶ 32, 41. In the October 2023 release the Secretary describes the "next step in his comprehensive" list maintenance program which involved sending out 185,208 notices based on the NCOA and another 37,285 based on other data sources, and those were just a fraction of the "679,749 pieces of mail sent to voters as part of

Georgia's robust list maintenance efforts."[6] Given this evidence that the State is conducting ongoing voter roll maintenance, Plaintiffs' complaints are reduced to the fact that the State has not conducted it on Plaintiffs' preferred schedule or in the precise manner Plaintiffs believe it should be done. But the NVRA does not prescribe any specific schedule beyond prohibiting maintenance in the sensitive days running up to a federal election and certainly does not require it to be done on demand and outside of the processes provided by the legislature.[7]

Plaintiffs' only basis for challenging Georgia's process as inadequate is that Plaintiffs "identified many voters who appear to have moved out of the jurisdiction in which they are registered but are nonetheless included on Georgia's active voter lists." Compl. ¶ 25. In other words, Plaintiffs' results varied to some unspecified degree from that of the State and they ask this Court to assume that the difference proves the State's program is inferior to Plaintiffs' project. It is Plaintiffs' process, however, that is flawed. They identified voters who "checked on the USPS Official Mail Forwarding Change of Address form that their move was permanent," Compl. ¶ 22, but seem unaware of the fact that many categories of voters including "people in the military and students away at college or university" use the permanent

---

[6] Press Release, Ga. Sec'y of State, *Raffensperger Continues Comprehensive Off-Year List Maintenance Effort* (Oct. 2, 2023), available at https://sos.ga.gov/news/raffensperger-continues-comprehensive-year-list-maintenance-effort (last visited Oct. 10, 2024).

designation even though they are "still eligible to vote at their prior address." *Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1270 (N.D. Ga. 2024); *see also* O.C.G.A. §21-2-217(b)(2) (rendering exclusively NCOA-based challenges to such voters "insufficient"). This Court recently found a similar process to "utterly lack[] reliability" to the point that it "verge[d] on recklessness." *Id.* at 1274.

Even had Plaintiffs proven that the voters they identified were ineligible, they fail to recognize that the NVRA itself contemplates that there will be more registered voters than eligible voters at any given time because voters cannot be immediately removed except in very specific scenarios. Plaintiffs further ignore that the statute uses the term "reasonable," a prescriptive choice that indicates that the law "confers broad discretion on the States to adopt [their own] standards," so long as they are "reasonable." *See, e.g.*, *Beal v. Doe*, 432 U.S. 438, 444 (1977); *PILF*, 2024 WL 1128565, at *10 (explaining that "Congress did not establish a specific program for states to follow for removing ineligible voters"); *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019) ("[T]he statute requires nothing more of the state."). Under the NVRA there is nothing "unreasonable" about having what looks like a surplus number of voters on the rolls at one moment in time.

Plaintiffs also fail to recognize the many equally plausible explanations for differences between their list and that of election officials. If Plaintiffs used either a list of voters or an NCOA database that were generated on different days than those

used by the state, for example, one would expect differences in the contents of each. Likewise, if Plaintiffs' homemade project relied on lower matching standards—something that is indeterminable based on their inscrutable description—one would expect differing results. But in any case, even Plaintiffs admit that Georgia may have sent notices to "some or all of the voters identified" by Plaintiffs—which, if true, would mean that the state had satisfied the NVRA even under Plaintiffs' incorrect interpretation of the law. Compl. ¶ 39.

### C. Plaintiffs fail to state a claim under state law.

The basis on which Plaintiffs allege a failure to comply with Georgia law is merely that their project arrived at results that varied to some degree from that of the state program. Like the NVRA, O.C.G.A. § 21-2-233 does not mandate any specific examination or timeframe in which the examination must be conducted, and, in fact, the General Assembly explicitly left those decisions to the Secretary "at his or her discretion." O.C.G.A. § 21-2-233(a). The evidence that demonstrated that the Secretary met the minimum federal-law requirement of conducting regular roll maintenance, *supra* II.B., also proves that he has satisfied the requirements of Section 233.

Count II separately must be dismissed because it relies exclusively on the alleged violation of O.C.G.A. § 21-2-233, but that statute grants no private right of action. "[I]t is well settled that violating statutes and regulations does not

automatically give rise to a civil cause of action by an individual claiming to have been injured from a violation thereof." *Gwinnett Cnty. v. Netflix, Inc.*, 367 Ga. App. 138, 144 (2023), *cert. denied* (Sept. 19, 2023). "Georgia has 'longstanding precedential authority rejecting the creation of implied private rights of action'" and it is the burden of a party asserting that an implied right exists to "overcome Georgia's presumption." *Id.* (internal citation omitted). Plaintiffs have not even attempted to identify a statutory right of action, and there is no basis on which this Court could find an implied private right of action under O.C.G.A. § 21-2-233, providing an independent reason that Count II must be dismissed.

## CONCLUSION

Plaintiffs lack standing, have failed to plead a violation of federal law, and seek state-law relief that this Court cannot provide. For these reasons (and those discussed in more detail above), BVMF respectfully requests that the Court grant its motion to dismiss all counts.

Dated: October 10, 2024

Respectfully submitted,

**/s/ Adam M. Sparks**
Adam M. Sparks
Ga. Bar No. 341578.
Anré D. Washington
Ga. Bar No. 351623
**KREVOLIN & HORST, LLC**
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: sparks@khlawfirm.com
Email: washington@khlawfirm.com

Uzoma N. Nkwonta*
Justin Baxenberg*
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue, Suite 400
Washington, D.C. 20001
(202) 968-4490
unkwonta@elias.law
jbaxenberg@elias.law
mmcqueen@elias.law

Tyler L. Bishop*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(202) 985-0628
tbishop@elias.law

*Counsel for Proposed Intervenor-Defendant BVMF*

*\*Pro Hac Vice Application Forthcoming*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, NDGa, the undersigned counsel hereby certifies that the foregoing document complies with the font and point selections approved by the Court in Local Rule 5.1C, NDGa. This document was prepared on a computer using Times New Roman font (14 point).

This 10th day of October 2024.

<u>/s/ **Adam M. Sparks**</u>
Adam M. Sparks
*Counsel for Proposed*
*Intervenor-Defendant BVMF*