**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

WILLIAM T. QUINN AND
DAVID CROSS,

                *Plaintiffs,*

       v.

BRAD RAFFENSPERGER, in his
official capacity as Secretary of State
of Georgia,

                *Defendant.*

Civil Action File No.:
1:24-cv-04364-SCJ

## BRIEF IN SUPPORT OF SECRETARY RAFFENSPERGER'S MOTION TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

LEGAL STANDARDS ...............................................................................3

BACKGROUND .........................................................................................4

I.      The National Voter Registration Act ..........................................4

II.     Georgia's List Maintenance Procedures and O.C.G.A. § 21-2-233...........6

ARGUMENT ..............................................................................................8

I.      The Court does not have jurisdiction over Plaintiffs' claims because
        Plaintiffs lack standing. ..............................................................8

        A.    Plaintiffs cannot satisfy the standing inquiry by alleging that
              they have suffered or will suffer vote dilution or lost confidence in
              the election. ......................................................................9

        B.    Plaintiffs' injuries are entirely speculative. ..............................12

II.     Plaintiffs fail to state a claim under the NVRA. ....................16

        A.    Plaintiffs have failed to plead that O.C.G.A. § 21-2-233 fails to
              satisfy the requirements of the NVRA. ....................................16

        B.    Plaintiffs have not stated a claim that the Secretary has violated
              the NVRA by not acting on Plaintiffs' demands. ........................21

CONCLUSION .........................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*A. Philip Randolph Inst. v. Husted,*
   838 F.3d 699 (6th Cir. 2016)....................................................................6

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)............................................................................4

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................4

*Bellitto v. Snipes,*
   935 F.3d 1192 (11th Cir. 2019)........................................ 4, 5, 6, 17

*Black Voters Matter Fund v. Raffensperger,*
   508 F. Supp. 3d 1283 (N.D. Ga. 2020) ........................................ 18

*CBS Inc. v. PrimeTime 24 Joint Venture,*
   245 F.3d 1217 (11th Cir. 2001)..................................................... 19

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398, 401 (2013)............................................................... 12

*Douglas v. United States,*
   814 F.3d 1268 (11th Cir. 2016).......................................................3

*Edison v. Douberly,*
   604 F.3d 1307 (11th Cir. 2010)..................................................... 19

*Edwards v. Prime, Inc.,*
   602 F.3d 1276 (11th Cir. 2010)............................................... 4, 22

*Fair Fight Action, Inc. v. Raffensperger,*
   No. 1:18-CV-5391-SCJ, 2021 WL 9553856 (N.D. Ga. Mar. 31, 2021)........ 18

*Fair Fight Inc. v. True the Vote,*
   710 F. Supp. 3d 1237 (N.D. Ga. 2024) ........................................ 23

*Harris v. Evans,*
   20 F.3d 1118 (11th Cir. 1994)............................................... 11, 12

*Husted v. A. Philip Randolph Inst.,*
   584 U.S. 756 (2018)....................................................................... 18

*Jacobson v. Fla. Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020)................................................ 9, 12

*Johnson v. City of Atlanta*,
   107 F.4th 1292 (11th Cir. 2024) ...................................................7

*Kokkonen v. Guardian Life Ins. of Am.*,
   511 U.S. 375 (1994)........................................................................3

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................. 9, 10

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*,
   512 F. Supp. 3d 1354 (M.D. Ga. 2021) ...................................... 23

*Smith v. Gte Corp.*,
   236 F.3d 1292 (11th Cir. 2001)....................................................3

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ......................................................................9

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ................................................................ 3, 15

*Trichell v. Midland Credit Mgmt., Inc.*,
   964 F.3d 990 (11th Cir. 2020).....................................................9

*United Public Workers v. Mitchell*,
   330 U.S. 75 (1947) ..................................................................... 15

*Voter Intergrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*,
   301 F. Supp. 3d 612 (E.D.N.C. 2017)........................................ 23

*Wood v. Raffensperger*,
   981 F.3d 1307 (11th Cir. 2020)........................................... 10, 11

**Statutes**

25 Pa. Stat. § 1901 ................................................................. 17, 20

52 U.S.C. § 20501 ....................................................................... 4, 5

52 U.S.C. § 20507 ...................................................................passim

Neb. Rev. Stat. § 32-329 ............................................................. 20

O.C.G.A. § 21-2-210 .......................................................................6

O.C.G.A. § 21-2-224 ........................................................................ 14

O.C.G.A. § 21-2-230 ........................................................................ 23

O.C.G.A. § 21-2-231 ..........................................................................8

O.C.G.A. § 21-2-233 ...................................................................passim

O.C.G.A. § 21-2-234 ..........................................................................8

O.C.G.A. § 21-2-235 ................................................................. 6, 7, 17

Tenn. Code § 2-2-106 ...................................................................... 20

U.S. Const. Art. III, § 2, cl. 1 ..........................................................8

Vt. Stat. tit. 17, § 2150 .................................................................... 20

## Other Authorities

*Raffensperger Continues Comprehensive Off-Year List Maintenance Effort,*
    Ga. Sec'y of State (Oct. 2, 2023) ..................................... 7, 17, 22

*The National Voter Registration Act Of 1993 (NVRA): Questions and Answers,*
    Department of Justice ......................................................... 6, 17

*What is ERIC?,*
    ERIC, https://ericstates.org/about/.................................................8

## Rules

Fed. R. Civ. P. 12(b)(1)......................................................................3

Fed. R. Civ. P. 12(b)(6)......................................................................3

Fed. R. Civ. P. 12(c) ..........................................................................8

## INTRODUCTION

In response to the Secretary's motion to dismiss, Plaintiffs have filed the Amended Complaint taking a new approach. Plaintiffs no longer seek expedited treatment, any claims under state law, or mandamus relief. Instead, Plaintiffs bring two claims under the National Voter Registration Act ("NVRA"), both of which should be dismissed. The first (Count I) alleges that the Secretary has failed to comply with his obligations under the NVRA because he did not respond to a letter sent by Plaintiffs, which alleged that Plaintiffs had identified Georgians in the United States Postal Service National Change of Address ("NCOA") database who were still registered to vote in their original counties in Georgia. The second (Count II) alleges that the Georgia Election Code fails to satisfy the NVRA because it delegates to the Secretary, the chief election official for the State of Georgia, the duty to set the frequency with which Georgia conducts NCOA database comparisons.

Neither claim fares any better than Plaintiffs' original Complaint. First, Plaintiffs lack standing to bring either claim. Plaintiffs' claims that they have suffered lost confidence in the electoral process or general vote dilution do not satisfy the standing inquiry in the Eleventh Circuit. As to Count II, which requests an advisory opinion from this Court to "help the legislature redraft O.C.G.A. § 21-2-233 . . . [and] help [the Secretary] better understand his responsibilities," Amended Complaint ("Am. Compl.") ¶ 63, Plaintiffs expressly

rely on an entirely hypothetical theory of injury in which the Secretary decided to cease all regular voter list maintenance, which both fails to constitute a claim of a concrete injury for purposes of standing and is completely detached from the reality of the Secretary's diligent list maintenance practices.

Even if Plaintiffs had standing, they have failed to state a claim under the NVRA. The plain language of the NVRA contradicts Plaintiffs' argument that O.C.G.A. § 21-2-233 fails qualify as a valid program for list maintenance under the NVRA. The NVRA does not prescribe the type of program the states must adopt, nor does it require that the legislature, rather than the Secretary, determine the timing of list maintenance activities. As to their claim that the Secretary failed to satisfy the requirements of the NVRA, Plaintiffs have still failed to allege facts sufficient to support a reasonable inference that the Secretary has failed to satisfy the requirements of the NVRA. The Amended Complaint contains even fewer factual allegations regarding the Secretary's actual list maintenance procedures than the original. And Plaintiffs' new analysis only underscores that Georgia's list maintenance procedures are working to ensure the integrity of Georgia's voter rolls.

The Amended Complaint makes even plainer that which was evident in the original—Plaintiffs believe they can use the NVRA to skip the process by which Georgia electors can challenge the eligibility of other voters. *See* O.C.G.A. § 21-2-230. That process would not permit Plaintiffs to sustain voter

2

challenges based solely on NCOA data. *See id.* § 21-2-230(b)–(c). To avoid that burden, Plaintiffs seek to force the Secretary to act in response to their NCOA "analysis."

For these reasons, the Secretary respectfully requests that the Court dismiss the Amended Complaint without leave to further amend.

## LEGAL STANDARDS

A defendant may move to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) where the district court lacks subject-matter jurisdiction over a claim. Federal courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case[.]" *Smith v. Gte Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001) (citations omitted). A defendant may challenge subject-matter jurisdiction facially or factually. *See Douglas v. United States*, 814 F.3d 1268, 1274–75 (11th Cir. 2016). A facial attack requires the court to examine the complaint, taking its allegations as true, to determine whether the plaintiff has established that the court has jurisdiction; to establish jurisdiction, a plaintiff must allege he has standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).

A defendant may also move to dismiss a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive such a motion,

"a complaint must contain specific factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if the complaint alleges sufficient facts to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The Court must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiffs," but the Court is not required to accept allegations that are merely legal conclusions. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010).

## BACKGROUND

### I.    The National Voter Registration Act

Congress enacted the NVRA with two sets of goals in mind. The first set of goals was "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "to make it possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2). In recognition of the fact that "easing registration barriers could threaten the integrity of our elections," *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019), the NVRA also articulated its second set of goals: "to protect the integrity of the electoral

process" and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)–(4). As the Eleventh Circuit observed, Congress sought to balance the competing interests of "easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls." *Bellitto*, 935 F.3d at 1198.

Section 8 of the NVRA requires the states to "conduct a general program that makes a *reasonable* effort to remove the names of ineligible voters from the official lists of eligible voters by reason of [] the death of the registrant; or [] a change in the residence of the registrant . . . ." 52 U.S.C. § 20507(a)(4) (emphasis added). The NVRA does not define what constitutes a "reasonable effort." *Bellitto*, 935 F.3d at 1205. One method of satisfying Section 8's list maintenance program requirement is to comply with the NVRA's "safe harbor" provision. *See id.* at 1203 (citing 52 U.S.C. § 20507(c)(1)). The safe harbor provision provides that a state "may meet the requirement of subsection (a)(4) by establishing a program under which" "change-of-address information supplied by [USPS] . . . is used to identify registrants whose addresses may have changed." 52 U.S.C. § 20507(c)(1). If it appears that a registrant may have moved outside the jurisdiction in which the registrant is registered, the registrar sends notice by forwardable mail instructing the registrant to return the card if his or her jurisdiction has not changed. *Id.* § 20507(c)(1), (d)(2)(A). The notice should contain information on how the registrant can continue to

be eligible to vote if the registrant has moved out of the jurisdiction in which he or she is registered. *See id.* § 20507(d)(2)(B).

The safe harbor provision is "one way in which states 'may' comply with their obligation under the NVRA to identify and remove voters who are no longer eligible due to a change of residence." *Bellitto*, 935 F.3d at 1204 (quoting *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 703 n.2 (6th Cir. 2016), *rev'd on other grounds*, 584 U.S. 756 (2018)). States do not have to use the NCOA safe harbor process. *See The National Voter Registration Act Of 1993 (NVRA): Questions and Answers*, DOJ, https://www.justice.gov/crt/national-voter-registration-act-1993-nvra (last visited Nov. 8, 2024) [*hereinafter* "DOJ Q&A"]. States "need only use reasonably reliable information" to identify potentially ineligible voters; "[t]he state is not required to exhaust all available methods . . . ." *Bellitto*, 935 F.3d at 1205.

## II.    Georgia's List Maintenance Procedures and O.C.G.A. § 21-2-233

To govern the maintenance processes for Georgia's official voter list, the Georgia General Assembly enacted O.C.G.A. § 21-2-210 *et seq*. The Secretary's obligations are addressed in O.C.G.A. §§ 21-2-233–235. The Secretary is charged with maintaining an "inactive" list of voters, in addition to the official voter list. O.C.G.A. § 21-2-235(a). Relevant here, the Secretary "is authorized to cause at his or her discretion the official list of electors to be compared to the [NCOA data] supplied by the United States Postal Service through its licensees

periodically for the purpose of identifying those electors whose addresses have changed." O.C.G.A. § 21-2-233(a). If the NCOA data suggests that a registrant may have moved outside the jurisdiction in which he or she is registered, the county registrar will send a notice as described above to the registrant; if the registrant does not respond in 30 days, he or she is moved to the inactive list. *Id.* § 21-2-233(c). Registrants who do not respond to the notice and do not vote in two election cycles are purged from the voter rolls. *See id.* § 21-2-235(b). The Secretary has conducted comparisons of the official voter list and the NCOA database as a part of Georgia's list maintenance efforts. *See Raffensperger Continues Comprehensive Off-Year List Maintenance Effort*, Ga. Sec'y of State (Oct. 2, 2023), https://sos.ga.gov/news/raffensperger-continues-comprehensive-year-list-maintenance-effort (last visited Nov. 8, 2024) [*hereinafter* "SOS Press Release"].[1]

Georgia conducts other types of list maintenance as well. In the first six months of every odd numbered year, the Secretary is responsible for sending a

---

[1] Plaintiffs initially conceded that the Secretary conducted list maintenance that included comparison of the official voter list to the NCOA database. *See* Complaint ("Compl.") ¶ 26. Nevertheless, the Court may still consider "a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). The frequency with which the Secretary conducts a comparison of the official voter roll to the NCOA database is central to Plaintiffs' claims, and the authenticity of the press release is not disputed.

confirmation notice to all voters on the official voter list "whom there has been no contact during the preceding five calendar years and who were not identified as changing addresses under Code Section 21-2-233[.]" O.C.G.A. § 21-2-234(a)(2). Georgia is also a member of the Electronic Registration Information Center ("ERIC"), *see What is ERIC?*, ERIC, https://ericstates.org/about/ (last visited November 8, 2024), which helps the Secretary identify records of those who may have moved out of state. The Secretary receives monthly lists of those who have been convicted of a felony, *see* O.C.G.A. § 21-2-231(a), died, *id.* § 21-2-231(d), proclaimed not to be citizens during jury duty, *id.* § 21-2-231(a.1), and have had voting rights removed due to mental incompetence, *id.* § 21-2-231(b), and transmits those names to the country registrars, *id.* § 21-2-231(c)–(e).

## ARGUMENT

### I.    The Court does not have jurisdiction over Plaintiffs' claims because Plaintiffs lack standing.

Even with the benefit of the Secretary's motion to dismiss, *see* Doc. 30, two proposed motions to dismissed filed by proposed intervenors, *see* Docs. 8-2, 12-3, and a proposed motion under Rule 12(c), *see* Doc. 19-4, Plaintiffs fail to establish that they have standing to bring their NVRA claims.

Article III limits federal courts to the consideration of "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1. The standing doctrine "is an essential and unchanging part of the case-or-controversy requirement of

Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy the standing inquiry, the plaintiff "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan*, 504 U.S. at 561).

Plaintiffs cannot establish that they have standing because they cannot show that they have the "first and foremost of standing's three elements": an injury in fact. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alterations adopted and quotations omitted). An injury in fact is "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (quotation omitted). A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (citation omitted).

## A. Plaintiffs cannot satisfy the standing inquiry by alleging that they have suffered or will suffer vote dilution or lost confidence in the election.

Plaintiffs do not allege any facts that would suggest that they have suffered a particularized injury. The Amended Complaint alleges that "Georgia's improperly maintained voter rolls have undermined . . . Plaintiffs' confidence and trust in the electoral process[,]" Am. Compl. ¶ 46, and that Plaintiffs have suffered vote dilution from the possibility that ineligible voters

are included on the rolls, *see id.* ¶¶ 1, 3, 32, 46. But the Eleventh Circuit has

been clear that these exact sorts of generalized grievances are insufficient to

confer standing on a plaintiff. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314

(11th Cir. 2020). "A generalized grievance is 'undifferentiated and common to

all members of the public.'" *Id.* (quoting *Lujan*, 504 U.S. at 575). Plaintiffs'

alleged injured confidence in the electoral process, *see* Am. Compl. ¶¶ 1, 3, 46,

or diluted votes, *see id.* ¶¶ 1, 3, 32; *id.*, Ex. 1 at 4, would be common not only to

all Georgia voters but indeed all *Americans*, *cf. Wood*, 981 F.3d at 1314. As the

Eleventh Circuit explained:

> Wood cannot explain how his interest in compliance with state
> election laws is different from that of any other person. Indeed, he
> admits that any Georgia voter could bring an identical suit. But
> the logic of his argument sweeps past even that boundary. All
> Americans, whether they voted in this election or whether they
> reside in Georgia, could be said to share Wood's interest in
> ensuring that a presidential election is properly administered.

*Id.* (quotations omitted and alterations adopted). As in *Wood*, any member of

the public could bring the same suit, making this precisely the type of

generalized grievance rejected by the Eleventh Circuit. The Amended

Complaint concedes this—Plaintiffs' case aims to "protect" "*Georgia's voters*

*from vote dilution*" and "*all Georgia voters' right to vote*" by safeguarding them

from improper vote dilution." Am. Compl. ¶¶ 3, 32 (emphasis added).

Plaintiffs' attempts to point to district court rulings from other circuits

are unavailing. *See id.* ¶ 46. That is because the Eleventh Circuit has been

clear that generalized grievances like lost confidence or vote dilution cannot constitute an injury-in-fact because "no single voter is specifically disadvantaged if a vote is counted improperly, even if the error might have a mathematical impact on the final tally and thus on the proportional effect of every vote." *Wood*, 981 F.3d at 1314 (quotation omitted). Even with the benefit of the Secretary's Motion to Dismiss the Complaint, Doc. 30, Plaintiffs have not added a single citation in the Amended Complaint to any case from the Eleventh Circuit holding that generalized vote dilution or diminished confidence and trust in the electoral process constitutes an Article III injury. They cannot do so because no such case exists. Nor apparently could Plaintiffs distinguish *Wood*, which forecloses these exact types of alleged injuries.

Neither can Plaintiffs establish standing by asserting an injury on behalf of *other* Georgia voters. Plaintiffs argue that the alleged out-of-state individuals are at risk of identity theft. *See* Am. Compl. ¶¶ 3, 32. Setting aside the completely speculative nature of that alleged injury, Plaintiffs cannot satisfy the injury-in-fact requirement by alleging that *other* Georgia voters (and not Plaintiffs themselves) may be at risk for identity theft. The Eleventh Circuit observes "the general principle that a litigant must assert his own legal rights and interests and may not ordinarily rely on the rights and interests of third parties." *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994). "The prohibition against third-party standing promotes the fundamental purpose of

11

the standing requirement by ensuring that the courts hear only concrete disputes between interested litigants who will frame the issues properly." *Id.* To the extent that a speculative risk of future identity theft could constitute an injury-in-fact, that injury would not be particularized to Plaintiffs.[2]

### B. Plaintiffs' injuries are entirely speculative.

"[W]hen plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *Jacobson*, 974 F.3d at 1245–46 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). That future elections[3] might be negatively impacted, potentially injuring Plaintiffs confidence in the electoral system or causing Plaintiffs to suffer vote dilution, is too speculative to satisfy the standing requirements of Article III. Even if lost confidence in the electoral process or vote dilution were particularized injuries (and they are not), the Amended Complaint makes clear that these injuries are speculative. *See, e.g.*, Am. Compl. ¶ 3 ("[*I*]*f* a voter

---

[2] The Amended Complaint does not allege facts suggesting that Plaintiffs would satisfy the requirements for the except to the prohibition against third-party standing. *See Harris*, 20 F.3d at 1122 ("[T]he litigant must have suffered an injury-in-fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." (quotations omitted)).

[3] Plaintiffs allege that this Court "effectively denied" their request for relief prior to the election. Am. Compl. ¶ 36. In fact, that is a problem of Plaintiffs' own making. This Court reminded Plaintiffs of the proper procedure for filing a motion for a TRO or preliminary injunction and for requesting expedited treatment of that motion. *See* Doc. 5 at 2. Plaintiffs elected to file nothing.

permanently moved out of state, and another individual uses that voter's information to cast an illegal ballot, this *could* result in the former Georgia resident being wrongfully accused of having cast the illegal vote." (emphasis added)), ¶ 10 ("This is particularly important in the context of absentee voting, where a person *could potentiall*y vote multiple times, or third parties *could* submit votes without the person's knowledge." (emphasis added)).

This is particularly true for the alleged vote dilution. The Amended Complaint does not allege facts sufficient to infer that any vote dilution has or is likely to occur because it does not allege in any non-conclusory manner that any unqualified voters are included on the official voter list.[4] The Amended Complaint recognizes this. *See* Am. Compl. ¶ 46 (alleging that Plaintiffs' injuries are "not speculative, *regardless of whether any vote dilution occurred or will occur*" (emphasis added)). Plaintiffs' analysis is based exclusively on the NCOA database, but as Plaintiffs concede, the NCOA database shows only individuals "whose addresses *may* have changed," *id.* ¶ 55 (quoting 52 U.S.C. § 20507(c)(1)) (emphasis added). Even with Plaintiffs' new analysis, any injury remains too speculative. Plaintiffs repeatedly concede that they do not know whether those that have filed a change of address have actually moved from

---

[4] Plaintiffs' failure to allege facts sufficient to support a reasonable inference that the Secretary has failed to comply with his obligations under the NVRA are discussed in more detail *infra*. *See* Sec. II.

their jurisdiction. *See, e.g.*, Am. Comp. ¶ 1 ("Georgia's current voter rolls have thousands of voter registrations that are *apparently* incorrect." (emphasis added)), ¶ 25 ("This process identified many voters who *apparently* have moved out of the jurisdiction in which they are registered but are nonetheless included on Georgia's active voter lists." (emphasis added)). Moreover, Plaintiffs conducted their latest "analysis" based on data from the NCOA database as of October 1, 2024, *id.* ¶ 39, but the deadline for voter registration in Georgia was not until October 7, 2024, *see* O.C.G.A. § 21-2-224. County election officials also have the power to continue to remove ineligible voters on an individualized basis and may have continued to do so. And although Plaintiffs have removed their concession in the Complaint that "Georgia may have also sent notices to some or all of the voters identified in Plaintiffs' September 3, 2024 notice letter—and further, such voters may have indicated to Georgia that the address listed on the voter's registration form is still correct," Compl. ¶ 39, it remains nonetheless true.

With respect to Count II in particular, the alleged risk of injury is entirely conjectural and completely detached from reality. Based solely on a misreading of the Secretary's Motion to Dismiss in this matter, *see* Am. Compl. ¶¶ 37, 56–60, Plaintiffs allege that the Secretary believes that O.C.G.A.§ 21-2-233 to would allow the Secretary to "take no action with respect to voter list maintenance." *Id.* ¶ 60. That is a ludicrous mischaracterization of the

Secretary's argument. Plaintiffs cannot articulate any risk of injury as they cannot credibly claim that there is any reasonable danger that the Secretary has any intention of discontinuing all voter list maintenance activities. In fact, the Amended Complaint is devoid of *any* allegations regarding the procedures for list maintenance that the Secretary has adopted, and the few allegations included in the original Complaint have been removed. Plaintiffs recognize this deficiency and apparently believe they can establish standing on the basis that "[a]n adjudication of this matter would . . . help the legislature redraft O.C.G.A.§ 21-2-233 to comply with the requirements of the NVRA[] [and] help Defendant better understand his responsibilities[.]" *Id.* ¶ 63. That would be the very definition of an advisory opinion, which Article III courts do not render. *See United Public Workers v. Mitchell*, 330 U.S. 75, 89 (1947).[5] Plaintiffs are asking this Court to render an opinion on whether, in a hypothetical world where the Secretary ceased to conduct any list maintenance, O.C.G.A. § 21-2-233 would satisfy Section 8 of the NVRA. Having dropped their state law claim, Plaintiffs are attempting to bootstrap a second NVRA claim based on nothing but a mischaracterization of the Secretary's argument in his motion to dismiss. That attempt should be rejected.

---

[5] As explained in the Secretary's motion to dismiss, *see* Doc. 30 at 9–10, statutory standing is distinct from Article III's requirement that the plaintiff must have suffered a concrete harm caused by defendant's alleged statutory violation. *See TransUnion*, 594 U.S. at 427.

## II.    Plaintiffs fail to state a claim under the NVRA.

The Amended Complaint purports to bring two claims under the NVRA. Count I alleges that the Secretary has violated the NVRA by failing to "investigate the data provided by Plaintiffs," Am. Compl. ¶ 51, and "correct an unreasonably large number of voter registrations," *id.* ¶ 44. Count II alleges that O.C.G.A. § 21-2-233 affords the Secretary too much discretion in when to compare the NCOA database to Georgia's official voter list and therefore fails to satisfy Section 8 of the NVRA. The Secretary first addresses Plaintiffs' facial attack on O.C.G.A. § 21-2-233 (Count II) and then addresses Plaintiffs' claim that the Secretary has applied O.C.G.A. § 21-2-233 in such a way as to fail to satisfy the requirements of the NVRA (Count I).

### A. Plaintiffs have failed to plead that O.C.G.A. § 21-2-233 fails to satisfy the requirements of the NVRA.

Count II alleges that O.C.G.A. § 21-2-233 fails to satisfy the NCOA safe harbor provision because it affords the Secretary too much discretion. Am. Compl. ¶¶ 53–63. Accordingly, Plaintiffs argue, Georgia law does not satisfy the requirements of Section 8 of the NVRA.

Section 8 of the NVRA requires only that states "conduct a general program that makes a *reasonable effort* to remove the names of ineligible voters" from the official voter list by reason of death of or a change in residence of the voter. 52 U.S.C. § 20507(a)(4) (emphasis added). The NVRA does not

define what constitutes a "reasonable effort," but the Eleventh Circuit has made clear that "the statute requires nothing more of the state." *Bellitto*, 935 F.3d at 1205. It does not demand perfection.

The NCOA safe harbor process is just one way to satisfy Section 8. While common, it is not uniformly used in the United States. Many states authorize the use of a confirmation mailing system. *See, e.g.*, 25 Pa. Stat. § 1901(b). And others, like Georgia, conduct a program whereby voters who have not made contact by, for example, voting in an election or updating their registration for a certain number of years can be removed from the official voter list. *See, e.g.*, O.C.G.A. § 21-2-235; *see also* DOJ Q&A.

Plaintiffs cannot argue that Georgia has failed to implement a general voter list maintenance program. The Amended Complaint is devoid of any allegations regarding Georgia's list-maintenance program, let alone allegations that would support an inference that Georgia's program under O.C.G.A. § 21-2-233 fails to comport with the NVRA. And as explained, it is public knowledge that the Secretary has adopted a robust process for conducting comprehensive list maintenance. *See* SOS Press Release. Accordingly, Plaintiffs do not and cannot argue that the Secretary has actually adopted a policy that he is not required to conduct list maintenance, nor has his office indicated in any way that list maintenance is not required. Instead, Plaintiffs argue that the Secretary's program is insufficient because the text of

O.C.G.A. § 21-2-233 affords the Secretary too much discretion in determining the nature of that program. That argument fails for multiple reasons.

First, courts, including this Court, have opined that "the list maintenance scheme Georgia uses is explicitly permitted by the NVRA" in cases that have claimed that Georgia's list maintenance activities were too harsh rather than too lax. *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2021 WL 9553856, at *16 (N.D. Ga. Mar. 31, 2021), *opinion clarified*, No. 1:18-CV-5391-SCJ, 2021 WL 9553849 (N.D. Ga. Nov. 15, 2021) (Jones, J.); *Black Voters Matter Fund v. Raffensperger*, 508 F. Supp. 3d 1283, 1299 n.24 (N.D. Ga. 2020) (Jones, J.); *see also Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 768 (2018) (upholding Ohio's nearly identical voter list maintenance procedure).

Second, the plain text of the NVRA does not support Plaintiffs' argument. The NVRA does not define *how* each state is to craft a program that makes a reasonable effort to remove those voters who are no longer eligible due to death or having changed residential addresses. Section 8 requires only that the state "*conduct* a general program," 52 U.S.C. § 20507(a)(4) (emphasis added), and the NCOA safe harbor provision provides that a state can meet the requirements of Section 8 by "*establishing* a program" that identifies ineligible candidates based on NCOA data, 52 U.S.C. § 20507(c)(1) (emphasis added). The plain language does not impose a requirement of the type Plaintiffs seek,

*i.e.*, that the Georgia General Assembly be the body to determine all the contours of that program. *See Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010) (Courts' "authority to interpret statutory language is constrained by the plain meaning of the statutory language in the context of the entire statute, as assisted by the canons of statutory construction." (citations omitted)); *see also CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1227 (11th Cir. 2001) ("When the words of a statute are unambiguous, then, [the] first canon . . . is also the last: judicial inquiry is complete" (citation omitted)). Nothing in the text of the NVRA bars Georgia from delegating responsibility of establishing list maintenance frequency to the state's chief election officer.

Third, the NVRA has no specific periodicity requirements. Plaintiffs suggest that there is some requirement that a comparison of the official voter list to the NCOA database be conducted on a specified schedule such as every year (or even every month) because some states other than Georgia have chosen to set particular schedules for their list-maintenance programs. *See* Am. Compl. ¶ 38. But to the extent that other states' programs have any bearing on Georgia's compliance with the NVRA (and they have none), states adopt a variety of list-maintenance programs that provide varying levels of discretion to election officials on varying timelines. For example, contrary to Plaintiffs' claim, Pennsylvania does not require use of the NCOA database. Pennsylvania elections commissions can choose between comparing NCOA

19

data to the official voter list or using a confirmation mailing process, whereby non-forwardable mail is sent to all registered voters, and voters are identified based on if the notice is returned undeliverable. *See* 25 Pa. Stat. § 1901(b); *see also* Tenn. Code § 2-2-106(b)–(c) (requiring only biennial maintenance for address verification and permitting but not mandating use of NCOA database). Biennial maintenance in odd years is hardly uncommon. *See* Vt. Stat. tit. 17, § 2150. Nebraska requires only that the Secretary of State perform list maintenance "on a regular basis" and gives the election commissioner a choice to use NCOA data or a biennial confirmation notice system. Neb. Rev. Stat. § 32-329(1)–(2).

Plaintiffs concede that "neither the NVRA nor [O.C.G.A.] § 21-2-233 specify exactly how often the state must perform maintenance on its voter lists based on change of address information[.]" Am. Compl., Ex. A at 5. Plaintiffs' real problem with O.C.G.A. § 21-2-233 is not that it affords the Secretary discretion but that it does not demand that the Secretary take action when Plaintiffs see fit. Plaintiffs' facial challenge to O.C.G.A. § 21-2-233 is unsupported by the text of the NVRA and by Plaintiffs' allegations in the Amended Complaint. The Court should therefore dismiss Count II.

**B. Plaintiffs have not stated a claim that the Secretary has violated the NVRA by not acting on Plaintiffs' demands.**

Count I of the Amended Complaint alleges that the Secretary "is violating 52 U.S.C. § 20507(a)(4)(B) by failing to make a 'reasonable effort' to maintain its voter lists" and therefore is not complying with the safe harbor provision under 52 U.S.C. § 20507(c)(1)(B). Am. Compl. ¶ 48. But even with the benefit of Plaintiffs' updated "analysis," the Amended Complaint fails to allege sufficient facts to support this claim.

First, Plaintiffs allege that the Secretary "has not provided any indication that the state will investigate these registrations or take action to confirm the voter addresses as required by law . . . ." *Id.* ¶ 1. The Amended Complaint does not identify any provision of the NVRA that requires the Secretary to act in response to a data set submitted by a private citizen or act in response to such a request. There is no basis to infer from the Secretary's decision not to respond to Plaintiffs' letter that the Secretary is failing to conduct list maintenance as required under Section 8 of the NVRA.

Second, Plaintiffs still do not allege any facts that point to flaws in the Secretary's list maintenance processes. In fact, the Amended Complaint is scrubbed of the few references in the original Complaint that concerned the Secretary's list maintenance efforts. The Secretary has published information concerning list maintenance in the lead up to the November 5, 2024 General

21

Election.[6] But Plaintiffs do not make any allegations concerning those efforts. In fact, Plaintiffs do not allege that the Secretary failed to send notices and remove those who did not timely respond.[7] Instead, they ask this Court to infer that the Secretary has not removed inactive voters based solely on Plaintiffs' own "analysis" of the NCOA database.

That inference is not reasonable. There is no information provided in the Amended Complaint concerning how Plaintiffs conducted their matching analysis, and Plaintiffs have not attached the data to the Amended Complaint. The Secretary therefore has no way of knowing that these individuals who have filed NCOA change of address requests are even the same individuals that Plaintiffs have identified on the official voter roll. Plaintiffs also concede that to the extent they have correctly matched any names, they have identified only individuals who—according to Plaintiffs—have "apparently" moved. Am. Compl. ¶ 25. Implicit in that allegation is an understanding shared by multiple Georgia district courts: that NCOA data alone is inherently unreliable in determining whether an individual is no longer eligible to vote at their prior

---

[6] In 2023, the Secretary mailed 185,208 notices based on NCOA forms and another 37,285 postcards to individuals who did not file a change of address form based on data provided by the DDS. *See* SOS Press release.

[7] The Amended Complaint contains a single, conclusory allegation that the Secretary has failed to send notices and move voters who did not respond to the inactive list. *See* Am. Compl. ¶ 49. But the Court is not required to accept this conclusory allegation, which merely recites the Secretary's duties under O.C.G.A. § 21-2-233(c). *See Edwards*, 602 F.3d at 1291.

address. *See Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1266, 1270 (N.D. Ga. 2024) (Jones, J.); *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1369–70 (M.D. Ga. 2021). Plaintiffs assume that if one files a permanent change of address notification, the filer has necessarily "moved out of the jurisdiction in which they are registered." Am. Compl. ¶ 25. Not so. Military members and students attending college are among the groups that might file a permanent change of address with USPS though they are "still eligible to vote at their prior address." *Fair Fight Inc.*, 710 F. Supp. 3d at 1270. The Georgia Election Code also recognizes that NCOA data alone will not accurately identify ineligible voters; thus NCOA data alone is insufficient to sustain an elector challenge against another elector. *See* O.C.G.A. § 21-2-230(b). Plaintiffs point to a single North Carolina federal district court case that relied on an analysis of "reliable data" in refusing to dismiss an NVRA list-maintenance claim. Am. Compl. ¶ 48. In that case, the plaintiffs used data from the United States Election Assistance Commission and the United States Census Bureau to show that registration rates in one county exceeded 100% of eligible electors in that county. *See Voter Intergrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612, 618–20 (E.D.N.C. 2017). The court held that a reasonable inference could be drawn that list maintenance was not being conducted in accordance with the NVRA. *See id.* at 620. That is not analogous to what Plaintiffs have done. Plaintiffs' "analysis" is based on

23

unreliable data from the NCOA database, and the Amended Complaint contains no allegations concerning the matching process used by Plaintiffs.

Third, Plaintiffs updated "analysis" only underscores the flaws in their argument. Plaintiffs' pie charts show that between June 30, 2024 and October 1, 2024, 1,331 of the 2,029 voters (65.9%) in Cherokee County who filed permanent mail forwards directing their mail to an out of state address had dropped off the Georgia official voter roll. Am. Compl. ¶ 41. For Forsyth county, 1,134 of the 1,722 voters (65.6%) who had filed out-of-state mail forwards dropped from the official voter roll. *Id.* ¶ 42. The only thing that Plaintiffs' data shows is that the Secretary's and county election officials' practices continued to improve the integrity of Georgia's official voter rolls in compliance with the NVRA. The individuals who dropped from the official voter list could have been identified as ineligible on an individual basis or updated their own voter registration in this period. It could be the case that the Secretary had already sent notices pursuant to O.C.G.A. § 21-2-233(b) and was waiting the 30-day period for a reply. And the individuals remaining on the active voter roll as of October 1, 2024 could be individuals to whom the Secretary has already sent notice and confirmed residency. But the removal of individuals from the voter roll shows that the state's list maintenance processes continued to operate.

For all these reasons, there is no basis to support a reasonable inference that, because some active voters may or may not match the names of

individuals who filed change of address notifications, the Secretary has failed to conduct a reasonable program to remove voters who are no longer eligible to vote based on a change in residency. Count I of the Amended Complaint should be dismissed for failure to state a claim.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint for lack of jurisdiction or failure to state a claim.

This 8th day of November, 2024.

Respectfully submitted,

CHRISTOPHER M. CARR          112505
Attorney General

BRYAN K. WEBB                743580
Deputy Attorney General

*/s/ Elizabeth T. Young*
ELIZABETH T. YOUNG           707725
Senior Assistant Attorney General

*/s/ Alexandra M. Noonan*
ALEXANDRA M. NOONAN          733236
Assistant Attorney General

*Attorneys for Secretary of State Brad Raffensperger*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(C).

/s/ Alexandra M. Noonan
ALEXANDRA M. NOONAN        733236
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing **BRIEF IN SUPPORT OF SECRETARY RAFFENSPERGER'S MOTION TO DISMISS THE AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF e-filing system, which will send notification of such filing to the parties of record via electronic notification.

Dated: November 8, 2024.

*/s/ Alexandra M. Noonan*
ALEXANDRA M. NOONAN          733236
Assistant Attorney General