IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WILLIAM T. QUINN AND DAVID CROSS, *Plaintiffs,* v. BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, *Defendant.* | Civil Action File No.: 1:24-cv-04364-SCJ |

**REPLY IN SUPPORT OF SECRETARY RAFFENSPERGER'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

## INTRODUCTION

Rather than showing this Court why their Amended Complaint should not be dismissed, Plaintiffs' response to Defendant's motion reads more like an entirely new complaint than a defense of the existing one. They advance new allegations and theories found nowhere in their Amended Complaint, which is impermissible in responding to a motion to dismiss. This Court should not permit the Plaintiffs to inject entirely new claims into a response brief and force the Secretary to confront and rebut them for the first time on reply.

Even if the Court considers these new claims, they fare no better than the original ones. Plaintiffs' attempt to convert their generalized "vote dilution" injuries into particularized ones by claiming that Gwinnett County is a "swing" county is both at odds with their existing pleadings and illogical when applied to federal elections, which determine the winner by the count of all votes statewide. Nor does Plaintiff's claim of lost confidence resulting from this supposed vote dilution turn their generalized injury into a particularized one. The 11th Circuit has not recognized this type of claim as sufficient for standing, and almost every court that has addressed the issue has refused to do so.

Plaintiffs' arguments in opposition to the Secretary's Rule 12(b)(6) motion fare no better. They misconstrue the Secretary's argument while misunderstanding the law, suggesting that private citizens may compel the Secretary to conduct on-demand voter list maintenance in response to

unsolicited data compiled with an unknown methodology. That interpretation is unsupported by the Georgia Code and the NVRA.

## ARGUMENT

**I.　Plaintiffs do not have standing to bring their claims.**

Plaintiffs' tacit abandonment of their existing theories in favor of new ones shows that their Amended Complaint fails to allege a concrete, particularized, non-speculative injury. They now claim that the NVRA's private right of action is itself a concrete injury, but it is not. Then, they advance new theories of injury that fare no better than the ones they pled in their Amended Complaint, failing to demonstrate a sufficient basis for Article III standing under either scenario.

### A.　The existence of a private right of action under the NVRA does not exempt Plaintiffs from Article III.

Plaintiffs claim that the NVRA's provision of a private right of action under the NVRA satisfies Article III's requirement to show a concrete injury for purposes of standing. *See* Dkt. 49 ("Opp'n") at 6–7. Not so. As the Secretary noted, *see* Dkt. 48 ("Mot.") at 15 n.5, statutory authority to file a suit is distinct from Article III's requirement that the plaintiff must have suffered a concrete harm caused by defendant's alleged statutory violation. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).

Plaintiffs suggest that Congress, in creating a private right of action under the NVRA, automatically made Plaintiffs' "intangible" injuries concrete.

Opp'n at 6–7. The Supreme Court in *Spokeo, Inc. v. Robins* flatly rejected that argument, explaining that "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." 578 U.S. 330, 341 (2016). Plaintiffs cite no authority suggesting that Congress intended to elevate every alleged violation of the NVRA, no matter how intangible, to a concrete injury. The only case Plaintiffs cite, *Bellitto v. Snipes*, 935 F.3d 1192, 1199 (11th Cir. 2019), does not address standing at all.

### B. Plaintiffs have not suffered a particularized injury.

Plaintiffs offer two potential theories of particularized injury: vote dilution and lack of confidence in Georgia's electoral process. As to the first, Plaintiffs propose a new theory not alleged in the Amended Complaint: that their votes as residents of Gwinnett County have been diluted. Even if Plaintiffs could amend their complaint in their Opposition, that argument is irrelevant and foreclosed by the 11th Circuit's decision in *Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020). As to the second, the 11th Circuit does not recognize generic loss of confidence claims as a particularized and concrete injury sufficient to form a basis for Article III standing. Plaintiffs' standing arguments also depend on factual allegations that are not in the Amended Complaint and often are unsupported by any citation.

### 1. Plaintiffs have not suffered a particularized injury from their alleged "vote dilution."

The 11th Circuit has been clear regarding when allegations of vote dilution constitute a particularized injury in fact. *See Wood*, 981 F.3d at 1314. While vote dilution can be the basis for Article III standing, *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1247–48 (11th Cir. 2020), "it requires a point of comparison." *Wood*, 981 F.3d at 1314. The 11th Circuit explained that, "in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to 'irrationally favored' voters from other districts." *Id*. But a voter who "bases his standing on his interest in ensuring that only lawful ballots are counted", *id*. (cleaned up), amounts to "a generalized grievance [that], no matter how sincere, cannot support standing," *id*. (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013)).

Plaintiffs make only one attempt to distinguish their case from *Wood*. They argue, for the first time in Opposition, that they have an adequate point of comparison because Plaintiffs, as residents of Gwinnett County, have their vote diluted as compared to residents of other counties. *See* Opp'n at 13–14. There are myriad problems with that argument.

First, it is entirely absent from the Amended Complaint. Parties cannot amend pleadings to include new allegations via an opposition to a motion to dismiss in lieu of seeking leave to amend the complaint. *Huls v. Liabona*, 437

4

F. App'x 830, 832 n.5 (11th Cir. 2011) (per curiam).[1] Yet that is precisely what Plaintiffs have done. The Amended Complaint does not mention Gwinnett County at all; it makes only generic allegations of alleged vote dilution. *See* Am. Compl. ¶¶ 1, 3, 32. It makes no claim that Plaintiffs' votes in Gwinnett County are somehow diluted to be worth less than citizens of other counties. Nothing in the paragraphs to which Plaintiffs cite, *see* Opp'n at 13 (citing Am. Compl. ¶¶ 20–46), supports this new theory of injury. Nor does it appear in the letter sent to the Secretary attached to the Amended Complaint. Am. Compl., Ex. A. The Amended Complaint does not allege that Gwinnett is a "swing" county or make any allegations regarding Gwinnett voter registrations at all.[2]

Worse still, this theory of injury is in direct conflict with the Amended Complaint, which does not claim that Gwinnett votes are diluted as compared to votes from other counties, but instead asserts multiple times that *all* Georgia voters are affected. *See* Am. Compl. ¶ 3 (aim of this suit is to "protect

---

[1] Because this argument is not raised in the Amended Complaint and therefore did not provide the Secretary with fair notice of Plaintiffs' claim, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Secretary respectfully requests that the Court refuse to consider it, along with any unsupported factual claims contained in Plaintiffs' Opposition, *see* Opp'n at 13–14.

[2] The Court should not take judicial notice of Plaintiffs' claim that Gwinnett is a "swing" county. *See* Opp'n at 13 n.3. The Amended Complaint does not reference swing counties, and their alleged fact that Gwinnett is a "recent swing county" does not meet Fed.R.Evid. 201(b)'s standard for judicial basis, as it is not "generally known within the trial court's territorial jurisdiction", nor can it "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

5

*Georgia's voters* from vote dilution" (emphasis added)); *id.* ¶ 32 ("[T]his relief would protect Plaintiffs' *and all Georgia voters' right to vote* by safeguarding them from improper vote dilution." (emphasis added)). The Amended Complaint also provides two charts alleging failures of list maintenance in two counties, neither of which is Gwinnett: Cherokee County and Forsyth County. Neither is alleged to be a "swing" county. The only other county alleged to have many erroneous registrations is Fulton, which is also not alleged to be a "swing" county. In fact, the Amended Complaint makes clear that Plaintiffs believe this to be a statewide problem affecting many (if not all) counties. It identifies Cherokee and Forsyth Counties only "[b]y way of example," Am. Compl. ¶¶ 41–42, and alleges that "[d]ata for other counties show similar numbers, and in some counties, these numbers are particularly high (i.e., roughly 3,358 in Fulton County)", *id.* ¶ 43. That cannot be squared with Plaintiffs' new theory that they are particularly injured as Gwinnett voters.

Second, even if the Amended Complaint contained these claims, it would not satisfy Article III's particularized injury requirement. Even if Gwinnett County were somehow "targeted" because of political trends by voters attempting to double register, this could not cause vote dilution (or any other claimed injury) in a *federal* election, in which the winners for President and U.S. Senator are determined by the *statewide* popular vote. *See* O.C.G.A. § 21-2-501(f). The Amended Complaint makes clear that it concerns the 2024 *federal*

6

election. *See* Am. Compl. ¶¶ 9–14, 27, 34; *id.*, Ex. A at 1. To the extent allegedly erroneous voter registrations occur, whether those registrations are in one county versus another has no relevance in elections decided by statewide popular vote.[3] Plaintiffs' alleged injury is one that would be felt by all Georgia voters and constitutes a generalized grievance. *See Wood*, 981 F.3d at 1314.

> 2. *Plaintiffs cannot satisfy the standing inquiry by alleging that they have suffered subjective lost confidence in the election.*

Plaintiffs' second theory is that they have suffered lost confidence in the electoral process. Plaintiffs do not cite a single case from the 11th Circuit supporting the proposition that generic claims of lost confidence in the electoral process constitute a concrete, particularized injury in fact. *See* Opp'n at 8–9. Though isolated district courts[4] have recognized standing based on lost

---

[3] Elections for the U.S. House of Representatives are determined by voting at the congressional *district level*. Districts can comprise multiple counties and counties can be split among multiple districts. Gwinnett County residents are split into three different congressional districts. *See* Georgia Congressional District Map, Ga. DOT, https://www.dot.ga.gov/DriveSmart/MapsData/Documents/Statewide/CongressionalDistricts.pdf (last visited Dec. 6, 2024).

[4] Of Plaintiffs' five cases, one does not address lost confidence at all. *See Wis. Voter All. v. Millis*, 720 F. Supp. 3d 703 (E.D. Wis. 2024). One is factually distinct in that plaintiffs received robocalls stating mail-in voting information could be used to collect old debts and fulfill warrants. *See Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 515 (S.D.N.Y. 2021). The remaining three, *Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919 (S.D. Ind. 2012); *Green v. Bell*, No. 321CV00493RJCDCK, 2023 WL 2572210 (W.D.N.C. Mar. 20, 2023); *Jud. Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091 (D. Colo. 2021), have been criticized by other district courts. *See, Jud. Watch, Inc. v. Illinois State Bd. of Elections*, No. 24 C 1867, 2024 WL 4721512, at *5 (N.D. Ill. Oct. 28, 2024)

7

confidence, "the majority view" is that "a generalized grievance of decreased confidence" or "generalized concerns over vote dilution do not give rise to standing[.]" *Jud. Watch, Inc.*, 2024 WL 4721512, at *5 (decreased confidence in the electoral process was not sufficiently concrete or particularized to pursue a claim under Section 8 of the NVRA). Courts in Michigan, Iowa, Texas, Maryland and Nevada have all agreed that "lost confidence" claims are nothing more than generalized grievances that do not give rise to standing. *See Repub. Nat'l Comm. v. Benson*, No. 1:24-CV-262, 2024 WL 4539309, at *9 (W.D. Mich. Oct. 22, 2024); *Iowa Voter All. v. Black Hawk Cnty.*, 515 F. Supp. 3d 980, 991–92 (E.D. Iowa 2021); *Martinez-Rivera*, 166 F. Supp. 3d at 789; *Md. Election Integrity, LLC v. Md. State Bd. of Elections*, No. 24 C 672, 2024 WL 2053773, at *3–4 (D. Md. May 8, 2024); *Aguilar*, 2024 WL 4529358, at *5; *cf. Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 83 (2019) (Gorsuch, J., concurring) ("Who, after all, would have trouble recasting a generalized grievance about governmental action into an 'I-take-offense' argument for standing?").[5]

Plaintiffs make the argument (again, newly raised and missing from the Amended Complaint) that their alleged lost confidence is *particularized* to

---

(calling *King* an "outlier"); *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 803 n.18 (W.D. Tex. 2015) (*King* was incorrectly decided); *Repub. Nat'l Comm. v. Aguilar*, No. 2:24-CV-00518-CDS-MDC, 2024 WL 4529358, at *5 (D. Nev. Oct. 18, 2024) (*King*, *Green*, and *Griswold* were unpersuasive).

[5] For this reason, oral argument on this issue is unnecessary. *See* Dkt. 51.

them—that "these disturbing facts are not known by the general public" or that the "general public [has not] had the same interactions with the Defendant" that Plaintiffs have had. *See* Opp'n at 10. *Id*. But neither Plaintiffs' alleged special knowledge nor their heightened level of disturbance makes them any more injured by vote dilution than their less informed or more stoic peers. In a case of true vote dilution, a voter is harmed by the fact that their vote matters less than another's, regardless of what they know or how they feel about it.

Although *Wood* addressed standing based on vote dilution, its reasoning applies equally here to a claim for standing based on lost confidence in the electoral process. The 11th Circuit made clear a plaintiff asserts only a generalized grievance if he "cannot explain how his interest in compliance with state election laws is different from that of any other person." 981 F.3d at 1314. That reasoning applies equally to a claim that an individual's vote is diluted as it does to a claim that an individual's confidence in the electoral process is injured by that same dilution. *See Aguilar*, 2024 WL 4529358, at *5 (citing *Wood* in denying standing based on lost confidence). If vote dilution itself is not sufficient to support Article III standing, Plaintiffs' subjective feelings about that alleged dilution certainly cannot serve as a basis for standing.

### 3. *Plaintiffs' alleged injuries are speculative.*

Plaintiffs' arguments that their injuries are not speculative are both unavailing and rely on facts not pled in the Amended Complaint. First,

9

Plaintiffs claim that voter fraud exists, defining voter fraud as "when a voter votes multiple times." *See* Opp'n 15–16. It is unclear how that shows that *Plaintiffs'* alleged vote dilution and lost confidence from alleged voter list errors are not speculative. Plaintiffs point to no authority that holds that because "voter fraud" may have occurred in past elections, a claim based on the mere possibility of vote dilution or fear thereof is therefore non-speculative.

Second, Plaintiffs' argument is wholly unsupported by—and in many cases contradicted by—the Amended Complaint. Plaintiffs claim that "the Amended Complaint included a few examples of data summaries showing thousands of double registrations in each of two Georgia counties." Opp'n at 16 (citing Am. Compl. ¶¶ 4–5, 41–43). That is at best an error and at worst a misleading description of the allegations. The Amended Complaint pleads only that voters on the June 2024 data list were still listed as active in October even though they had filed NCOA notices. Am. Compl. ¶¶ 40–43. It says nothing about these individuals being "double register[ed]." Further, the Amended Complaint repeats that Plaintiffs "are not seeking to remove individuals from the voter rolls," only to "correct" their registrations. Am. Compl. ¶ 2; *see also id.* ¶ 33. One is hard pressed to understand why Plaintiffs would not request removal of individuals they found to be "double register[ed]." In fact, the Amended Complaint does not allege that any "voter fraud" is occurring at all.

Third, Plaintiffs rely on sources that are not included in the Amended

Complaint and of which this Court cannot properly take judicial notice. Plaintiffs rely on a Heritage Foundation website, a non-governmental source, for the proposition that "dozens of instances" of voter fraud occurred in Georgia in 2024. Opp'n at 15–16 & n.4. This is neither a fact generally known in this Court's jurisdiction nor based on a source whose accuracy cannot reasonably be questioned, and judicial notice is therefore not permitted under Fed. R. Evid. 201(b). Plaintiffs also request judicial notice for an allegation that is not only improper for judicial notice, but false and misleading. Citing a report found on the website of a private think tank, Plaintiffs allege that "the number of instances in which voters are registered to multiple addresses is significantly higher, between 2.2 and 8% of registered voters." *Id.* at 16. But their source actually makes the claim that double registration is higher among the rich, saying "the double-registration rate for individuals in the bottom quartile of housing prices is 2.2%, while it rises to 8.0% for those in the top 1%."[6] This misstated "fact" cannot properly be judicially noticed, nor is it relevant to the Amended Complaint, which does not allege that any of the challenged registrants is double registered. Plaintiffs then cite a news article about the Secretary's successful identification of noncitizens registered to vote.

---

[6] Gordon Dahl et al., *Double registration and strategic voting across state lines*, CEPR (Oct. 29, 2024) https://cepr.org/voxeu/columns/double-registration-and-strategic-voting-across-state-lines.

11

*See* Opp'n at 16 n.5. This source is not the proper subject of judicial notice and is not relevant. The Amended Complaint does not concern noncitizens voting,[7] and this article underscores the Secretary's ongoing list maintenance efforts.[8]

Finally, Plaintiffs argue that "a substantial risk that Plaintiffs' votes are being devalued vis-à-vis those of other voters … is yet another reason why [they] … have almost no confidence in Georgia's election process." Opp'n at 17. That shows that their alleged lost confidence injury is no different from their alleged vote dilution injury, which are equally speculative. "Courts have widely concluded that an alleged injury related to a lack of confidence in a voting system is 'too speculative to establish an injury in fact[.]'" *Aguilar*, 2024 WL 4529358, at *6 (quoting *Lake v. Hobbs*, 623 F. Supp. 3d 1015, 1027–28 (D. Ariz. 2022)) (collecting cases); *see Repub. Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 411 (4th Cir. 2024) (Diaz, CJ., concurring).

---

[7] No support is provided for the claim that "the fact that a type of crime has been detected in a jurisdiction is invariably a sign that many similar crimes have succeeded without being detected." Opp'n at 16 n.5.

[8] It is ironic that Plaintiffs accuse the Secretary of relying on extrinsic facts, *see* Opp'n at 24–25, in citing the Secretary's October 2023 press release (which, unlike Plaintiffs' sources, *is* a government document). Not only is it a government document sufficiently reliable to meet Fed. R. Evid. 201(b) standards, Plaintiffs cannot complain when their Complaint cites to and quotes from the same document. Compl. ¶ 26 n.1. The Secretary only uses the press release to show the existence of list maintenance efforts, which Plaintiffs do not deny. This again differs from Plaintiffs' extrinsic sources, which Plaintiffs use to inject new—and in the case of their claim of rising double registrations, false—purported facts to try to salvage their arguments.

## II. Plaintiffs have failed to state a claim under the NVRA.

In opposition to the Secretary's Rule 12(b)(6) motion, Plaintiffs first argue that the Secretary's interpretation of O.C.G.A. § 21-2-233 means that "he can avoid having to perform his mandatory duties under § 21-2-233(c) by simply never performing a comparison under § 21-2-233(a)." *Id.* at 20. That is a strawman. It is not what the Secretary argued or what the Georgia Code says. The Secretary argued that he is statutorily empowered to set the frequency with which he compares the active voter rolls to the U.S.P.S. National Change of Address ("NCOA") database, and neither he nor Plaintiffs claim he simply does not do this at all. Nothing in O.C.G.A. § 21-2-233(c) is rendered "meaningless" because it is the Secretary who sets the frequency.

Nothing in the Georgia Code requires the Secretary to conduct on-demand list maintenance in response to a private citizen's request. Plaintiffs argue that O.C.G.A. § 21-2-233(c) does not "specify who must cause the comparison to be done," and this somehow obligates the Secretary to act in response to Plaintiffs' letter. Opp'n at 21. Section 21-2-233(c) does not specify who must cause the comparison to be done because O.C.G.A. § 21-2-233(a) has already done so—it is the Secretary. Moreover, O.C.G.A. § 21-2-233(c) requires action only "[i]f it appears from the change of address information supplied by the licensees of the [USPS]" that an active, registered voter has moved to a different address outside of the county. Plaintiffs sent USB drives purportedly

13

containing private citizens' analysis of unknown methodology. *See* Am. Compl., Ex. A at 4. Nothing in O.C.G.A. § 21-2-233 requires the Secretary to alter the timing or method of his list maintenance in response to receipt of an unsolicited USB drive with data prepared by unknown persons using unknown methods.

Plaintiffs claim that they may simply allege that "Defendant failed to adequately compare voter lists" and that this Court must credit that assertion. Opp'n at 21. But the Court is not "required to accept the labels and legal conclusions in the complaint as true." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010). Plaintiffs bear the burden of pleading factual allegations with "enough heft to set forth a plausible entitlement to relief." *Id.* (quotations omitted). They have not done so.

Plaintiffs next claim that the NVRA "expressly provides" that NCOA data alone is enough to "support a challenge under state law." Opp'n at 22. Plaintiffs point only to the section of the NVRA permitting states to use NCOA data to identify registrants who may have moved and to whom the state will send a notice. *See id.* It does not provide that states must permit private individuals to mass challenge voter registrations based on NCOA data alone. Indeed, Georgia has declined to do so. *See* O.C.G.A. § 21-2-230; Mot. at 2.

Plaintiffs then complain that the Georgia Code requires removal of deceased persons from the elector list on a monthly basis, *see* O.C.G.A. §21-2-231, suggesting that the Legislature's specificity as to the timing of those

14

removals means that the Secretary should not have discretion over the timing of list maintenance for address changes. *See* Opp'n at 23. Those statutory provisions are irrelevant to Plaintiffs' claims. The reasons for treating differently a change of address and a death are obvious—a person only dies once, and appearance on the list of deceased persons from the local registrar of vital statistics is a reliable indicator that they have died. By contrast, a person may move many times and may file a change of address form for reasons other than a permanent relocation of their place of residence.

Finally, Plaintiffs accuse the Secretary of relying on facts outside the Amended Complaint. The Secretary's Motion to Dismiss explains the basis for which the Secretary has requested the Court consider the Secretary's press release concerning list maintenance efforts. *See* Mot. at 7 n.1; *supra,* n.8. The remaining "facts" that Plaintiffs challenge are not facts at all. Opp'n at 24–25. The Secretary did not argue that individuals identified in Plaintiffs "analysis" will have a reason for an address change other than a permanent change in residence. *See id.* at 25. The Secretary gave examples of situations in which a voter could appear on the NCOA list yet still validly remain on the active voter roll. The Amended Complaint relies expressly on the unreasonable inference that the presence of active voters on the NCOA list means the Secretary has failed to satisfy his NVRA obligations. The Amended Complaint makes no other allegations to support Plaintiffs' claims.

15

This 6th day of December, 2024.

        Respectfully submitted,

| | |
|---|---|
| CHRISTOPHER M. CARR | 112505 |
| Attorney General | |
| | |
| BRYAN K. WEBB | 743580 |
| Deputy Attorney General | |
| | |
| */s/ Elizabeth T. Young* | |
| ELIZABETH T. YOUNG | 707725 |
| Senior Assistant Attorney General | |
| | |
| */s/ Alexandra M. Noonan* | |
| ALEXANDRA M. NOONAN | 733236 |
| Assistant Attorney General | |

*Attorneys for Secretary of State Brad Raffensperger*

# CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(C).

*/s/ Alexandra M. Noonan*
ALEXANDRA M. NOONAN     733236
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the foregoing **REPLY IN SUPPORT OF SECRETARY RAFFENSPERGER'S MOTION TO DISMISS THE AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF e-filing system, which will send notification of such filing to the parties of record via electronic notification.

Dated: December 6, 2024.

*/s/ Alexandra M. Noonan*
ALEXANDRA M. NOONAN    733236
Assistant Attorney General