# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WILLIAM T. QUINN and DAVID CROSS,

       Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official
capacity as Secretary of State of Georgia,

       Defendant.

Civil Action No.
1:24-cv-04364-SCJ

## BLACK VOTERS MATTER FUND'S BRIEF IN SUPPORT OF RENEWED MOTION TO INTERVENE AS DEFENDANT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

BACKGROUND .......................................................................................4

I.      Georgia's list maintenance obligations under the NVRA .............................4

II.     Plaintiffs' lawsuit ..........................................................................7

III.    Proposed Intervenor Black Voters Matter Fund ...............................................8

ARGUMENT ..........................................................................................11

I.      BVMF is entitled to intervene as a matter of right. .......................................11

      A.    The motion to intervene is timely. .....................................................12

      B.    The disposition of this case may impair BVMF's ability to protect its interests. .....................................................13

      C.    BVMF's interests are not adequately represented by the existing parties. .....................................................15

II.     The Court should alternatively grant BVMF permissive intervention under Rule 24(b). .....................................................19

CONCLUSION ........................................................................................20

# INTRODUCTION

For the second time, Plaintiffs ask this Court to hand Georgia's statewide voter roll maintenance process over to private parties. They attempt to do so first by ignoring the plain language of the National Voter Registration Act and second by reading in requirements that exist nowhere in the law. Proposed Intervenor BVMF seeks to protect the fundamental voting rights of its constituents—who are among the voters most at risk from voter purges such as those urged by Plaintiffs—as well as its own organizational interests, which would be impeded if Plaintiffs succeed in forcing baseless alterations to Georgia's voter rolls.

The National Voter Registration Act ("NVRA") advances several goals. Congress sought to increase the number of eligible citizens who register to vote and to enhance voter participation in elections for federal office while also maintaining accurate and current voter rolls. As a result, the NVRA strikes a delicate balance between its voter engagement and list maintenance goals. It prescribes certain list maintenance procedures and baselines, but imposes strict guardrails to prevent undue or erroneous purges and outright disenfranchisement of eligible, registered voters. Georgia law similarly prescribes specific procedures and time frames for the Secretary of State and county officials to maintain the state's voter rolls.

Plaintiffs seek to weaponize the NVRA and corresponding provisions of state law to micromanage the State's list maintenance and force the Secretary to undertake

brand-new mass purges. Based entirely on allegations that Plaintiffs have themselves identified thousands of purportedly ineligible voters by personally matching unverified national change-of-address ("NCOA") information with a concededly outdated voter registration list, the Amended Complaint declares that the Secretary is in violation of a duty under the NVRA to conduct a program that makes a "reasonable effort" to remove ineligible voters, 52 U.S.C.A. § 20507(a)(4)(B), and that some voters remain on the State's "official list" of active voters in violation of state law, O.G.C.A. § 21-2-233.

For relief, Plaintiffs demand an order compelling the Secretary to instruct county officials to mail notices to voters whom Plaintiffs believe may have moved, and to move their registrations *en masse* from the "active" list to the "inactive" list. Such relief would violate rudimentary principles of federal and state law and disregard clearly applicable safeguards for Georgia voters by giving private parties (such as Plaintiffs) the power to trigger mass voter purges.

Black Voters Matter Fund ("BVMF" or the "Fund") seeks to protect both the fundamental voting rights of its constituents—who are among the voters most at risk of having their registrations purged by the aggressive relief sought—and the Fund's own organizational interests, which are also threatened by Plaintiffs' action. BVMF is entitled to intervene as a matter of right under Federal Rule of Civil Procedure 24(a) because this lawsuit threatens to impair its interests as a practical matter and

no existing party adequately represents those interests. BVMF's core mission includes securing its constituents' ability to exercise their right to vote, and the Fund invests significant resources in conducting its voter registration, education, and assistance activities to advance that mission. For the 2024 election cycle, BVMF committed millions of dollars to programs that helped its constituents register to vote in Georgia ahead of the October 7 deadline, as well as to ongoing programs aimed at turning out and educating voters. BVMF intends to continue engaging in such activities in future election cycles. If Plaintiffs' relief is granted, BVMF would have to divert scarce resources to identify voters at risk of wrongful removal—voters who likely include some constituents who registered to vote with the help of BVMF's core activities—and help those voters avoid removal from the active voter list or restore their rightful status on it.

The Secretary does not adequately represent BVMF's interests. He represents the interests of the government—and the competing obligations that come with responding to constituents with different views on how the relevant laws should be enforced—and is necessarily cabined by his statutory obligations to carry out list-maintenance protocols. In fact, BVMF previously sued the Secretary over list maintenance practices that harmed the Fund's constituents and its organizational mission. Notably, in that case, this Court recognized (based on BVMF's evidence) that reliance on NCOA data can erroneously identify eligible voters for removal

from registration lists. *See Black Voters Matter Fund v. Raffensperger*, 508 F. Supp. 3d 1283, 1298 (N.D. Ga. 2020) ("*BVMF*").

Because BVMF satisfies each requirement for intervention as a matter of right under Federal Rule of Civil Procedure 24(a), the motion to intervene should be granted. Alternatively, permissive intervention should be granted under Rule 24(b).

## BACKGROUND

### I. Georgia's list maintenance obligations under the NVRA

The NVRA requires states to provide simplified, voter-friendly systems for registering to vote. It establishes procedures designed to "increase the number of eligible citizens who register to vote" and also seeks to make it "possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters." 52 U.S.C. §§ 20501(b)(1)–(2). Congress enacted these measures in part because it found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." *Id.* § 20501(a)(3).

To further Congress's pro-voter objectives, the NVRA imposes strict restrictions on whether, when, and how a state may remove a voter from its registration rolls. *See* 52 U.S.C. §§ 20507(a)(3)–(4), (b)–(d). Immediate removal is permitted only in narrow and limited circumstances, such as when a voter requests

in writing to be deregistered or is convicted of a disenfranchising felony. *See id.* §§ 20507(a)(3)(A)–(B). Otherwise, a state may not remove voters from the rolls without first complying with prescribed procedural safeguards that Congress imposed to minimize risks of erroneous deregistration. *See id.* §§ 20507(a)(3)(C), (c), (d). For instance, in most cases a registrant may be removed from the rolls because of a change in residence only after failing to respond to a mailed notice *and* failing to appear to vote for two general elections after that notice. *Id.* § 20507(d)(1).

Considering these protections, courts have recognized that the NVRA "does not require states to immediately remove every voter who may have become ineligible." *Pub. Int. Legal Found. v. Benson*, No. 1:21-CV-929, 2024 WL 1128565, at *11 (W.D. Mich. Mar. 1, 2024) ("*PILF*"). Rather, Congress prioritized accuracy over speed and emphasized caution when removing voters to minimize the risk that qualified registrants will be disenfranchised. *See, e.g.*, *Bellitto v. Snipes*, 935 F.3d 1192, 1198–99 (11th Cir. 2019) (discussing the "balance" that Congress "crafted" in enacting the NVRA's list maintenance provisions).

Consistent with this understanding, the NVRA requires that each state make "a *reasonable* effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . death of the registrant" or a "change in the residence of the registrant." 52 U.S.C. §§ 20507(a)(4)(A), (B) (emphasis added). In other words, "Congress did not establish a specific program for states to follow for

removing ineligible voters," *PILF*, 2024 WL 1128565 at *10, nor did it demand perfection; it required only "reasonable" list maintenance efforts—and only in response to a registrant's death or change of residence, *Bellitto*, 935 F.3d at 1195. The NVRA also includes a safe harbor: states may meet this baseline requirement with respect to voters who have changed residences by establishing a program that uses "change-of-address information supplied by the Postal Service through its licensees" and following the notice procedure described above before initiating any removal procedures. *See* 52 U.S.C. § 20507(c)(1).

Georgia in turn has enacted guidelines that govern the registration of voters and maintenance of the state's voter rolls. *See generally* O.C.G.A. §§ 21-2-210 *et seq.* As relevant here, the Secretary may "at his . . . discretion" compare the "official list of electors" to NCOA information "supplied by the United States Postal Service through its licensees periodically for the purpose of identifying those electors whose addresses have changed." *Id.* § 21-2-233(a). When this NCOA information shows that a voter has moved outside of their county of registration, county officials send a notice to the voter's old address and, if the voter does not respond within 30 days, move the registration from the "active" list to the "inactive" list. *Id.* § 21-2-233(c). The voter's registration will be cancelled if the voter fails to vote or update their registration for two election cycles thereafter. *See id.* § 21-2-235. This Court has concluded that adherence to these procedures likely satisfies the state's obligation to

make a "reasonable effort" to remove ineligible voters under the NVRA's safe-harbor provision. *See BVMF*, 508 F. Supp. 3d at 1296.

In February 2024, the Secretary announced that nearly 200,000 voters' registrations had been cancelled based on this list maintenance process in preparation for the 2024 elections and that more than 300,000 notices were sent to voters based on NCOA information.[1]

## II.     Plaintiffs' lawsuit

Plaintiffs are residents of Suwanee, Georgia, who allege that they have personally identified "thousands" of active voters who may have moved by matching a voter registration list purchased from the state on June 30, 2024, to NCOA databases on some unspecified date thereafter. Am. Compl. ¶¶ 4, 5, 20–23. Based solely on the fact that these voters are still on the active voter rolls, Plaintiffs allege that the Secretary has failed to make a "reasonable effort" to maintain the state's voter rolls, 52 U.S.C. § 20507(a)(4), and is thus violating state law, which outlines a "discretion[ary]" maintenance procedure for voters who may have moved, O.C.G.A. § 21-2-233; Am. Compl. ¶¶ 27, 47–52. Notably, Plaintiffs subsequently obtained new data on October 1, 2024, that showed that, over the course of three

---

[1] Press Release, Ga. Sec'y of State, *Georgia's Historic Voter List Maintenance Serves as a National Model for Election Integrity* (Feb. 6, 2024), https://sos.ga.gov/news/georgias-historic-voter-list-maintenance-serves-national-model-election-integrity (last accessed Oct. 30, 2024).

months, nearly two-thirds of the voters they flagged based on the June data had been moved to inactive status. *See* Am. Compl. ¶¶ 41–43 (alleging that 65.9% of Cherokee County voters and 65.6% of Forsyth County voters that Plaintiffs identified based on June 30 data had been removed from active rolls by October 1).

Plaintiffs claim that the Secretary's alleged failure to conduct list maintenance activities on Plaintiffs' schedule has eroded their trust in Georgia's elections and risks diluting their votes. Am. Compl. ¶¶ 3, 27, 46, 51. They ask the Court to remedy these alleged harms by ordering the Secretary to direct county officials to send notices to the "thousands" of voters whose registrations Plaintiffs believe may be invalid, and "promptly transfer" them "to Georgia's inactive voter registration list" if they fail to respond. *Id.* at 21 (Prayer for Relief).

## III. Proposed Intervenor Black Voters Matter Fund

BVMF is a nonpartisan, nonprofit 501(c)(4) civic organization based in Fulton County whose mission is to increase voting power in communities of color. BVMF invests significant resources serving its core constituency—communities of color who have long been plagued by barriers to voting and civic participation. BVMF's core programs include voter registration, education, and turnout activities, as well as direct assistance during the registration and voting process.

BVMF has expended, and continues to invest, considerable time and mission-critical resources specifically to ensuring that voters in its constituency are registered

to vote, remain registered to vote, and cast ballots that will be counted. *See, e.g.*, *BVMF*, 508 F. Supp. 3d at 1291–92 & n.7 (describing BVMF's efforts in 2020 to reach voters whose registrations were "erroneously cancelled" based on NCOA data undertaken, in order to combat harm to BVMF's "core mission"). Ahead of the 2024 election, BVMF invested roughly $5 million in programs aimed at registering and turning out voters throughout the nation, including in Georgia. The investments include various events focused on registering and educating voters, social media and advertising campaigns about opportunities to register to vote, and direct outreach to Georgia voters to encourage participation and assist with the registration process. They also include trainings for BVMF's supporters, volunteers, and partner organizations who aid voters. BVMF provided substantial grants to partner organizations who have hosted registration events and work to engage and turn out voters in BVMF's core constituency. Consistent with its mission, BVMF intends to engage in similar activities in future election cycles.

Because Plaintiffs seek relief that would potentially remove "thousands" of voters from the "official list" of "active voters" and place them on the "inactive" voter list based on Plaintiffs' alleged use of unverified NCOA data, *supra* Background § II, BVMF has strong reason to fear that voters in its core constituency—including voters who registered to vote with the help of BVMF initiatives, or even voters within BVMF's network of supporters and volunteers—

are among those who will be erroneously targeted for removal. While Plaintiffs' Amended Complaint is vague about the voters they have identified, it specifies that "roughly 3,358" are in Fulton County—home to Georgia's largest Black population and where the bulk of BVMF's core constituency resides. *See* Am. Compl. ¶ 43. Moreover, BVMF's constituents—who are largely young, Black, and often come from low-income backgrounds—are disproportionately likely to lack a permanent residential mailing address or frequently move between addresses, placing them at elevated risk of being erroneously identified in Plaintiffs' program.

When such voters are removed from Georgia's official active voter list and placed on the inactive voter list, BVMF's mission of maximum voter registration and participation is frustrated. While Plaintiffs seem to emphasize that "inactive voters" can still vote on Election Day, they admit that such voters must take additional steps just to remain on the state's official voter list. Am. Compl. ¶ 31. They also entirely ignore that changes to a voter's registration status can discourage participation.[2] To combat these risks, which threaten to undermine BVMF's core activities, BVMF will be forced to divert its scarce resources and time to identifying

---

[2] *E.g.*, Press Release, *DeKalb Voter Registration and Elections Urges Residents to Verify Voter Status and Plan for Upcoming Election*, DeKalb. Co. (Sept. 5, 2024), available at perma.cc/4AAU-E4UC (explaining that "seeing an 'inactive' voter registration status" that resulted from an erroneous removal "can be confusing and alarming," and that it is necessary to ensure such voters are informed they can still vote).

and contacting voters who are swept up in Plaintiffs' purges to educate and assist them with maintaining or restoring their rightful inclusion on the official active voter list—just so they can cast their ballots without needless roadblocks.

And the threat is not only to the thousands of voters targeted in this case; to find for the Plaintiffs, the Court would have to hold that the officials are obligated to scrub voter rolls any time a private party alleges that it has found ineligible voters based on self-certified "reliable data." Keeping up with such challenges would demand a significant and sustained diversion of resources.

## ARGUMENT

### I.     BVMF is entitled to intervene as a matter of right.

Under Rule 24(a)(2), this Court "must allow" intervention as of right if: (1) the motion is timely; (2) movants have a legally protected interest in this action; (3) this action may impair or impede that interest; and (4) no existing party adequately represents Movants' interests. *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989). "[A]ny doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors." *New Georgia Project v. Raffensperger*, No. 1:21-CV-01229-JPB, 2021 WL 2450647, at *2 (N.D. Ga. June

4, 2021) (quoting *Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993)). BVMF easily satisfies these requirements.[3]

### A. The motion to intervene is timely.

BVMF's motion is timely. Plaintiffs filed their Amended Complaint on October 25, 2024, *see* ECF No. 45, and this Court held that the amendment mooted all outstanding motions to intervene on October 28, 2024. This motion follows before any significant action has occurred in the case. No hearings related to the Amended Complaint have occurred, briefing on the Defendant's Motion to Dismiss has only just concluded, ECF No. 53, and Defendant has moved to stay discovery pending resolution of that motion, ECF No. 50. BVMF is prepared to comply with any briefing or hearing schedules set by the Court and participate in any proceedings without delay. Because this case is in its infancy and there is no possible risk of prejudice to other parties, BVMF's motion to intervene is timely. *See Chiles*, 865 F.2d at 1213 (finding timely a motion to intervene filed seven months after a complaint, three months after the Defendant's motion to dismiss, and "before any discovery had begun").

---

[3] Rule 24(c) requires a motion to intervene to "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Should BVMF be granted intervention, it requests the Court's permission to file a Motion to Dismiss the Amended Complaint and accompanying brief in support, attached as Exhibit 2. Should the Court decline to grant BVMF's request to file a Motion to Dismiss, a Proposed Answer is attached as Exhibit 1.

On the other hand, as detailed below, BVMF would suffer substantial prejudice if it is denied intervention, because it would be unable to prevent harms to its constituents and organizational mission that would result from Plaintiffs' request to conduct systematic list maintenance and potentially remove eligible voters from the rolls. *Id.* (recognizing that courts may also weigh "the extent of prejudice to the [proposed intervenors] if their motion is denied" in analyzing timeliness).

## B. The disposition of this case may impair BVMF's ability to protect its interests.

BVMF has significant protectable interests that stand to be impaired by Plaintiffs' suit, satisfying the intertwined second and third elements of Rule 24(a)(2). To be sure, the movant "do[es] not need to establish that [its] interests *will* be impaired . . . only that the disposition of the action 'may' impair or impede [its] ability to protect [its] interests." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014). Ultimately, this inquiry is "flexible" and depends on the circumstances surrounding the action. *Chiles*, 865 F.2d at 1214.

Here, BVMF has a strong interest in ensuring that its constituents—at least some of whom are likely among those wrongfully identified for removal by Plaintiffs' faulty NCOA data-matching process—remain registered as active voters and successfully participate in future elections. Indeed, courts have granted intervention based on similar interests in NVRA cases seeking to remove registered voters from voter rolls. *Bellitto v. Snipes*, No. 16-cv-61474, 2016 WL 5118568, at

*2–3 (S.D. Fla. Sept. 21, 2016); *Jud. Watch, Inc. v. Illinois State Bd. of Elections*, No. 24 C 1867, 2024 WL 3454706, *3 (N.D. Ill. July 18, 2024); *Pub. Int. Legal Found. v. Winfrey*, 463 F. Supp. 3d 795, 799–800, 802 (E.D. Mich. 2020); Order, *Daunt v. Benson*, 1:20-cv-522 (W.D. Mich. Sept. 28, 2020), ECF No. 30 (same); Order, *Voter Integrity Proj. NC, Inc. v. Wake Cnty. Bd. of Elections*, No. 5:16-cv-683 (E.D.N.C. Dec. 1, 2016), ECF No. 26.

Given the breadth of Plaintiffs' requested relief—which could ultimately result in removal of thousands of Georgia voters from the active voter list, including more than 3,000 in Fulton County alone—this action presents an acute and realistic threat that at least some of the voters who registered with the help of BVMF's voter registration activities, or even those within in BVMF's network of supporters, volunteers, and staff who carry out BVMF's core initiatives, will have their registration status threatened. *See supra* Background § III. If these voters are disenfranchised or forced to navigate additional, unnecessary steps to exercise their right to vote, some of BVMF's mission-critical investments in voter registration and turnout will be undermined or even "nullif[ied]." *BVMF*, 508 F. Supp. 3d at 1291. To prevent such direct harm to its core activities, BVMF would be forced to divert its limited resources toward identifying, contacting, educating, and assisting affected voters.

Plaintiffs' purge effort would therefore impair BVMF's activities, mission, and resources, all of which would satisfy even Article III's more demanding standard for standing and is more than sufficient for intervention as of right. *See id.* (holding that BVMF and other groups established standing based on diversion of resources away from other election programs toward efforts to identify and educate voters removed from the rolls based on faulty NCOA data); *see also, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *New Georgia Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1286–87 (N.D. Ga. 2020); *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019).[4]

## C. BVMF's interests may not be adequately represented by the existing parties.

BVMF will not be assured adequate representation in this matter if it is denied intervention. The adequacy requirement "is satisfied if the applicant shows that representation of his interest 'may be' inadequate," and therefore "the burden of

---

[4] The Supreme Court's reaffirmation in *FDA v. Alliance for Hippocratic Medicine* that the organizational standing test requires an organization to show that the challenged act "perceptibly impair[s]" "core" activities to demonstrate an injury, 602 U.S. 367, 395 (2024) (explaining the holding of *Havens*, 455 U.S. at 379), is entirely consistent with this Court's findings in *BVMF*, which track that framework, *compare FDA*, 602 U.S. at 395, *with BVMF*, 508 F. Supp. 3d at 1291. This is because BVMF and other groups identify mission-critical "election related programs," explain why such core activities stand to be frustrated or even "nullif[ied]" by removal of voters from the rolls, and show that the groups must divert resources from other activities to combat these harms to their core activities. *BVMF*, 508 F. Supp. 3d at 1291–92.

making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (citing 3B J. Moore, Federal Practice 24.09–1 (4) (1969)); *accord Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 196 (2022); *Chiles*, 865 F.2d at 1214. Courts are accordingly "liberal in finding" this requirement to be met, because "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests." 7C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1909 (3d ed. 2024). Indeed, the Supreme Court recently cautioned that courts should not conduct this inquiry at too "high [a] level of abstraction," and reaffirmed that, even where the parties' interests "seem[] closely aligned," the burden to demonstrate inadequate representation remains "minimal" unless those interests are "identical." *Berger*, 597 U.S. at 196. This means that, even if the existing defendants oppose the relief Plaintiffs seek, it does not follow that they will adequately represent BVMF's interests.

This is especially true when the defendants are government entities. Because government parties' "views are necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it," courts have regularly found that "the burden [of establishing inadequacy of representation] is comparatively light." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) (citing *Conservation L. Found. of New England,*

*Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992), and *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996)); *accord Berger*, 597 U.S. at 196 (explaining the burden remains "minimal" where government party must "bear in mind broader public policy implications"); *see also, e.g.*, *Issa v. Newsom*, 2:20-cv-01044-MCE-CKD, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020); *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365, at *3 (D. Nev. Apr. 28, 2020).

The divergence of interests between government officials and private parties is particularly sharp in actions like this one that seek to identify and remove voters from the rolls. *Bellitto*, 2016 WL 5118568, at *2 (granting intervention as a matter of right to organization in voter purge challenge); *see also Jud. Watch, Inc.*, 2024 WL 3454706, at *4 (similar); *Winfrey*, 463 F. Supp. 3d at 799–800 (granting permissive intervention on this ground). This is because government defendants must balance competing objectives, including their list maintenance obligations, while groups like BVMF have a more limited focus on protecting their own interests and those of their voters. *Winfrey*, 463 F. Supp. 3d at 800 (citing *Bellitto*, 935 F.3d at 1198).

That is obviously the case here: While BVMF opposes use of error-prone list maintenance practices that burden duly registered voters, the Secretary of State is specifically charged with facilitating some of these acts. *See* O.C.G.A. §§ 21-2-210, 21-2-233. The Secretary's office is not institutionally designed to be a zealous

advocate for the maximum participation of BVMF's constituents and therefore cannot adequately represent BVMF—whose mission is to do just that. Indeed, that BVMF was forced to sue the Secretary precisely because Georgia's use of NCOA data threatens BVMF's constituents, *supra* at 3, demonstrates, at the very least, that BVMF's interests "may" not be adequately represented by the Secretary. *Trbovich*, 404 U.S. at 538 n.10; *cf. Meek v. Metro. Dade County*, 985 F.2d 1471, 1478 (11th Cir. 1993) ("Any doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors because it allows the court to resolve all related disputes in a single action.").

BVMF has renewed its motion to intervene in part because arguments set forth by the Secretary in his recent filings made concrete the stark contradiction between the interests of the Secretary and BVMF. For example, the Secretary defends the adequacy of his maintenance program by pointing not only to the NCOA matching process, but also to Georgia's program for removing voters with whom election officials have had "no contact" during a specified period. Mot. to Dismiss the Am. Compl. at 7–8. BVMF previously sued the Secretary alleging that this same program violates the Equal Protection Clause of the U.S. Constitution. *BVMF*, 508 F. Supp. 3d at 1298. The Secretary embraces other statutes through which "Georgia electors can challenge the eligibility of other voters," Mot. to Dismiss Am. Compl. at 2, but such challenges have targeted thousands of the very voters BVMF seeks to empower

and protect. *See Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1272–73 (N.D. Ga. 2024) (noting the "discriminatory" history of such laws which "had the momentous effect of decreasing the number of Black voters"). That the Secretary relies for his defense on programs and statutes that directly harm BVMF's core mission makes clear that the Secretary does not—and cannot—adequately represent the interests of BVMF.

## II. The Court should alternatively grant BVMF permissive intervention under Rule 24(b).

If the Court does not grant intervention as a matter of right, BVMF requests that the Court exercise its discretion to allow intervention under Rule 24(b). The Court has discretion to grant a motion for permissive intervention when: (1) the proposed intervenor's claim or defense and the main action have a question of law or fact in common, and (2) the intervention will not unduly delay or prejudice the adjudication of the original parties' rights. *See* Fed. R. Civ. P. 24(b); *Chiles*, 865 F.2d at 1213; *Ga. Aquarium, Inc. v. Pritzker*, 309 F.R.D. 680, 690 (N.D. Ga. 2014). "[T]he claim or defense clause of Rule 24(b)(2) is generally given a liberal construction." *Ga. Aquarium*, 309 F.R.D. at 690.

BVMF easily meets these requirements. First, BVMF will inevitably raise common questions of law and fact because it seeks to oppose the very purges that Plaintiffs seek to compel in this lawsuit. *Supra* Argument § I.B. Second, for the reasons already explained, the motion to intervene is timely, and given the early

stage of this litigation, intervention will not delay or prejudice the adjudication of the rights of the original parties. *Supra* Argument § I.A. BVMF is prepared to proceed in accordance with the schedule this Court determines, and its intervention will only serve to contribute to the complete development of the factual and legal issues before the Court.

## CONCLUSION

For these reasons, BVMF respectfully requests that the Court grant its motion to intervene as a matter of right, or in the alternative, to intervene permissively.

Dated: December 9, 2024          Respectfully submitted,

**/s/ Adam M. Sparks**
Adam M. Sparks
Ga. Bar No. 341578
Anré D. Washington
Ga. Bar No. 351623
**KREVOLIN & HORST, LLC**
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3500
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: sparks@khlawfirm.com
Email: washington@khlawfirm.com

Uzoma N. Nkwonta**
Marcos Mocine-McQueen**
Renata M. O'Donnell*
James J. Pinchak*
**ELIAS LAW GROUP LLP**

250 Massachusetts Avenue, Suite 400
Washington, D.C. 20001
(202) 968-4490
unkwonta@elias.law
mmcqueen@elias.law
rodonnell@elias.law
jpinchak@elias.law

Tyler L. Bishop**
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(202) 985-0628
tbishop@elias.law

*Counsel for Proposed Intervenor-
Defendant Black Voters Matter Fund*

*\*Pro Hac Vice Application Forthcoming*
*\*\*Admitted Pro Hac Vice*

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, NDGa, the undersigned counsel hereby certifies that the foregoing document complies with the font and point selections approved by the Court in Local Rule 5.1C, NDGa. This document was prepared on a computer using Times New Roman font (14 point).

This 9th day of December 2024.

/s/ **Adam M. Sparks**
Adam M. Sparks
*Counsel for Proposed*
*Intervenor-Defendant Black*
*Voters Matter Fund*