# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

WILLIAM T. QUINN and DAVID CROSS,

       Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,

       Defendant.

Civil Action No.
1:24-cv-04364-SCJ

---

## BLACK VOTERS MATTER FUND'S PROPOSED MOTION TO DISMISS AMENDED COMPLAINT

COMES NOW BLACK VOTERS MATTER FUND, by and through its undersigned counsel of record, and files this Proposed Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

The basis for the motion is more fully set forth in Black Voters Matter Fund's accompanying Brief in Support of Motion to Dismiss Amended Complaint.

Dated: December 9, 2024

Respectfully submitted,

**/s/ Adam M. Sparks**
Adam M. Sparks
Ga. Bar No. 341578
Anré D. Washington
Ga. Bar No. 351623
**KREVOLIN & HORST, LLC**

**Exhibit 2 to BVMF's Renewed Motion to Intervene as Defendant**

1201 W. Peachtree St., NW
One Atlantic Center, Suite 3500
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: sparks@khlawfirm.com
Email: washington@khlawfirm.com

Uzoma N. Nkwonta**
Marcos Mocine-McQueen**
Renata M. O'Donnell*
James J. Pinchak*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue, Suite 400
Washington, D.C. 20001
(202) 968-4490
unkwonta@elias.law
mmcqueen@elias.law
rodonnell@elias.law
jpinchak@elias.law

Tyler L. Bishop**
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(202) 985-0628
tbishop@elias.law

*Counsel for Proposed Intervenor-
Defendant Black Voters Matter Fund*

*\*Pro Hac Vice Application Forthcoming
\*\*Admitted Pro Hac Vice*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WILLIAM T. QUINN and DAVID CROSS,

     Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official
capacity as Secretary of State of Georgia,

     Defendant.

Civil Action No.
1:24-cv-04364-SCJ

# BLACK VOTERS MATTER FUND'S PROPOSED BRIEF IN SUPPORT OF
## MOTION TO DISMISS AMENDED COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

ARGUMENT ......................................................................................................6

I.  Plaintiffs lack standing. ...............................................................................6

II. Plaintiffs fail to state a claim under the NVRA...........................................11

    A.  Plaintiffs' list maintenance project does not reveal any NVRA
        violations. ..........................................................................................12

    B.  Plaintiffs have not identified any conflict between the NVRA
        and the list maintenance procedures prescribed by Georgia law. .......15

CONCLUSION ..................................................................................................17

**INTRODUCTION**

Shortly before the November 2024 election, Plaintiffs—two self-described "taxpayer[s]" and registered voters in Suwanee, Georgia—sued the Secretary of State for what Plaintiffs allege was a failure to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" from the voter rolls. ECF No. 1 ("Compl.") ¶ 11 (quoting 52 U.S.C. § 20507(a)(4)(B)). The Complaint did not dispute that Georgia already conducts regular voter roll maintenance, nor did it identify any specific defects in that process. Rather, Plaintiffs' claims rested entirely on their representation that they attempted their own private voter roll maintenance project and found some individuals on the rolls who had allegedly submitted a mail forwarding request to the U.S. Postal Service.

Armed with this inconclusive evidence from unverified sources, Plaintiffs demanded drastic, improbable relief: they asked the Court to replace Georgia's list-maintenance program with their own, allowing Plaintiffs to determine which voters are no longer Georgia residents; mark those individuals as "inactive" and force them to provide additional information in order to vote in the November 2024 election; kickstart the process of removing these voters from the rolls, weeks before the election; and enter an injunction against state officials on state law grounds—a remedy squarely foreclosed by longstanding precedent. Worse yet, Plaintiffs did not allege any particularized injury that gave them standing to challenge Georgia's list

maintenance procedures, instead relying on a vote-dilution theory that the Eleventh Circuit has rejected. *Wood v. Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020).

Plaintiffs have since filed an Amended Complaint, but it makes little attempt to address these legal errors. *See* ECF No. 45 ("Am. Compl."). Plaintiffs still lack an injury sufficient to confer Article III standing; they invoke the National Voter Registration Act ("NVRA") to demand that the Court insert itself into Georgia's process for maintaining its list of eligible voters, but fail to allege a violation of that statute; and in support of their claims, Plaintiffs cite evidence that *confirms* Georgia has removed voters from the rolls through the state's voter roll maintenance process. For all these reasons, Plaintiffs' Amended Complaint should be dismissed.

## BACKGROUND

The NVRA requires states to provide simplified, voter-friendly systems for registering to vote. It establishes procedures designed to "increase the number of eligible citizens who register to vote" and also seeks to make it "possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters." 52 U.S.C. §§ 20501(b)(1)–(2). Consistent with this understanding, the NVRA requires that each state make "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . death of the registrant" or a "change in the residence

of the registrant," 52 U.S.C. §§ 20507(a)(4)(A), (B), but does not mandate the use of any "specific program for states to follow for removing ineligible voters," *Pub. Int. Legal Found. v. Benson*, 721 F. Supp. 3d 580, 595 (W.D. Mich. 2024) ("*PILF*").[1]

To further Congress's pro-voter objectives, the NVRA imposes strict restrictions on whether, when, and how a state may remove a voter from its registration rolls. *See* 52 U.S.C. §§ 20507(a)(3)–(4), (b)–(d). Immediate removal is permitted only in narrow and highly limited circumstances, such as when a voter requests to be deregistered or is convicted of a disenfranchising felony. *See id.* §§ 20507(a)(3)(A)–(B). Otherwise, a state may not remove voters from the rolls without first complying with prescribed procedural safeguards that Congress imposed to minimize risks of erroneous deregistration. *See id.* §§ 20507(a)(3)(C), (c), (d). For instance, in most cases a registrant may be removed from the rolls because of a change in residence *only* after failing to respond to a mailed notice *and* failing to appear to vote for two general elections after that notice. *Id.* § 20507(d)(1).

In accordance with the NVRA, Georgia has enacted procedures to govern the registration of voters and maintenance of the state's voter rolls. *See generally*

---

[1] The NVRA also includes a safe harbor: states may meet this requirement with respect to voters who have changed their residence by establishing a program that uses "change-of-address information supplied by the Postal Service through its licensees" and the notice procedure described below to confirm whether registered voters have moved and commence removal procedures as to those individuals. *See* 52 U.S.C. § 20507(c)(1).

O.C.G.A. §§ 21-2-210 *et seq.* The Secretary has a statutory duty to ensure the state has an NVRA-compliant maintenance program. O.C.G.A. § 21-2-210. As part of that effort, the Secretary may "at his . . . discretion" compare the "official list of electors" to National Change of Address ("NCOA") information "supplied by the United States Postal Service through its licensees periodically for the purpose of identifying those electors whose addresses have changed." *Id.* § 21-2-233(a). When this NCOA information suggests that a voter may have moved outside of their county of registration, county officials send a notice to the voter's old address and, if the voter does not respond within 30 days, move the registration from the "active" to "inactive" list. *Id.* § 21-2-233(c). The voter's registration will be cancelled if the voter fails to vote or update their registration for two election cycles thereafter. *See id.* § 21-2-235(b).

This Court has concluded that the use of these procedures likely satisfies the state's obligation to make a "reasonable effort" under the NVRA's safe-harbor provision. *See Black Voters Matter Fund v. Raffensperger*, 508 F. Supp. 3d 1283, 1296 (N.D. Ga. 2020). Indeed, it has resulted in substantial numbers of voters being removed from the rolls: in February 2024, the Secretary announced that nearly 200,000 voters' registrations had been cancelled using this process in preparation

for the 2024 elections, and that tens of thousands more voters were moved to "inactive" status based on NCOA information.[2]

Plaintiffs William T. Quinn and David Cross are the latest activists to attempt to persuade a court in recent months to interfere with Georgia's voter registration system. *See, e.g.*, *Frazier v. Fulton Cnty. Dep't of Registration & Elections*, No. 1:24-CV-03819-SCJ (N.D. Ga. 2024) (voluntarily dismissed for lack of statutory standing). Quinn and Cross report that they purchased a list of voters from the state on June 30, 2024, and subsequently used the Postal Service's NCOA database to conduct their own homespun matching process, attempting to identify voters they believe have moved and are no longer eligible to vote where they are registered. Am. Compl. ¶¶ 20-21.

Plaintiffs report that after coming up with a list of voters they believe to be ineligible, they sent the Secretary a letter asking that he undertake *ad hoc* list maintenance proceedings by initiating the removal process against these voters.[3] The

---

[2] Press Release, Ga. Sec'y of State, *Georgia's Historic Voter List Maintenance Serves as a National Model for Election Integrity* (Feb. 6, 2024), available at https://sos.ga.gov/news/georgias-historic-voter-list-maintenance-serves-national-model-election-integrity (last accessed Dec. 8, 2024). This Court "may take judicial notice of matters of public record without converting a Rule 12(b)(6) motion [to dismiss] into a Rule 56 [summary judgment] motion." *Serpentfoot v. Rome City Comm'n*, 322 Fed. Appx. 801, 807 (11th Cir. 2009) (per curiam) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)).

[3] Plaintiffs insist that they "did not request the removal or cancellation of any voter's registration," Compl. ¶ 34, but ignore the fact that the mailing of a notice and placement on the list of inactive voters are the initial steps of the removal process.

Secretary did not accede to Plaintiffs' demands, and, on September 26, 2024, Plaintiffs filed this suit, alleging that their matching process identified an unspecified number of voters who had asked the Postal Service to forward their mail and who still appeared on Georgia's voter rolls. On this basis alone, Plaintiffs first alleged that the Secretary—and, through him, the state of Georgia—violated the state's voter roll maintenance statute, O.C.G.A. § 21-2-233, and the NVRA. On October 25, 2024, Plaintiffs filed an amended complaint in which they abandoned their doomed effort to seek relief under state law and added a largely redundant second claim under the NVRA.

## ARGUMENT

### I. Plaintiffs lack standing.

The Court lacks jurisdiction to hear Plaintiffs' claims because Plaintiffs have not alleged a cognizable injury-in-fact and thus fail to satisfy Article III's standing requirements.

To demonstrate standing at the pleading stage, Plaintiffs must allege that they have suffered "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs must establish these elements for each claim for relief that they assert. *E.g.*, *California v. Texas*, 593 U.S. 659, 660 (2021) (explaining that "just like suits for every other type of remedy, declaratory-

judgment actions must satisfy Article III's case-or-controversy requirement"); *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) ("Article III's standing requirements apply to state-law claims brought in federal court.").

Plaintiffs' threadbare allegations are woefully inadequate even to "allege the 'first and foremost of standing's three elements': an injury in fact." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 338). An injury is "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996-97 (11th Cir. 2020); *Spokeo*, 578 U.S. at 340. Plaintiffs assert two so-called "injuries," neither of which is judicially cognizable.

First, Plaintiffs claim that the current list maintenance regime has "undermined (and will continue to undermine) Plaintiffs' confidence in the electoral process." Am. Compl. ¶¶ 46, 51. Notwithstanding a few scattered examples, courts have generally concluded that an alleged injury related solely to a lack of confidence in election administration "is 'too speculative to establish an injury in fact.'" *Thielman v. Fagan*, No. 3:22-CV-01516-SB, 2023 WL 4267434, at *4 (D. Or. June 29, 2023) (quoting *Lake v. Hobbs*, 623 F. Supp. 3d 1015, 1028–29 (D. Ariz. 2022)), *aff'd sub nom. Thielman v. Griffin-Valade*, No. 23-35452, 2023 WL 8594389 (9th Cir. Dec. 12, 2023) (collecting cases). And *no* federal circuit court has recognized

this type of harm as a cognizable injury for Article III purposes. For good reason: if a subjective lack of confidence in governmental "process" is sufficient to invoke federal court jurisdiction, then standing becomes meaningless; any disagreement over policy could be reframed as a lack of confidence in the results. As the Supreme Court has now repeatedly explained, concerns that the law "has not been followed" constitute "precisely the kind[s] of undifferentiated, generalized grievance[s] about the conduct of government that [courts] have refused to countenance." *Lance v. Coffman*, 549 U.S. 437, 442 (2007); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[A] citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally."); *Wood*, 981 F.3d at 1315.

Second, Plaintiffs assert a vote dilution injury, Am. Compl. ¶¶ 1, 3, 9, that has been rejected by a "veritable tsunami" of courts across the country, *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742, at *9 (D. Colo. Apr. 28, 2021) (collecting cases), *aff'd*, No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022), including in this Circuit, *Wood*, 981 F.3d at 1315; *see also Fair Fight, Inc. v. True the Vote, Inc.*, 2:20-cv-0302-SCJ, 2021 WL 12299453, at *6 n.9 (N.D. Ga. Aug. 17, 2021) (recognizing this "theory of vote dilution is based upon a premise that the Eleventh Circuit and other courts have declined to uphold in other contexts on generalized grievance standing grounds"). And again, no circuit court

that has considered the theory has found it sustainable. That is because, as the Eleventh Circuit explained, "no single voter is specifically disadvantaged if a vote is counted improperly, even if the error might have a mathematical impact on the final tally and thus on the proportional effect of every vote." *Wood*, 981 F.3d at 1314–15 (citation omitted). A claimed vote dilution injury is merely a "paradigmatic generalized grievance that cannot support standing." *Id.*

As the cases recognize, Plaintiffs' alleged harm is fundamentally different in kind from a vote-dilution injury in the redistricting context, where the challenged map minimizes a particular voter's or a group's voting strength *as compared to other voters*. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207–08 (1962); *Wood*, 981 F.3d at 1314 (explaining that vote dilution may be an injury "in the racial gerrymandering and malapportionment contexts" but not where a voter alleges wrongful votes were allegedly counted due to fraud); *accord*, *e.g.*, *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. 2020) ("As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud."). Where the counting of contested ballots would "dilute" the voting power of all voters equally, there is no injury sufficient for Article III standing. *Wood*, 981 F.3d at 1314–15.

But even if the theory were cognizable, the Amended Complaint is devoid of any allegation indicating how Plaintiffs' votes would be diluted merely because the

names of the voters they identified appeared on the voter rolls. Submission of a change of address by itself is insufficient to establish that a voter has moved or is no longer properly registered—that is part of the reason why appearance on an NCOA database alone is insufficient to support a challenge to a voter's residence under Georgia law, O.C.G.A. § 21-2-230(b), or to remove a voter from the rolls under federal law.[4] Even then, being registered to vote and voting are not the same thing— the mere presence of potentially ineligible voters on the voter rolls does not indicate that any unlawful voting has occurred. These logical gaps in Plaintiffs' allegations are independently fatal to establishing Article III standing. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964 (11th Cir. 2005) ("The plaintiff has the burden to clearly and specifically set forth facts sufficient to satisfy Art. III standing requirements.").[5]

Third, Plaintiffs cannot evade the injury-in-fact requirement merely by invoking the NVRA's private right of action. *See* Am. Compl. ¶¶ 26, 45. That is because the Supreme Court has now repeatedly "rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute

---

[4] Indeed, just this year the General Assembly amended O.C.G.A. § 21-2-230(b) to make clear that the mere presence of a name in the NCOA database "shall be insufficient cause to sustain" a challenge to a voter's eligibility. 2024 Ga. Laws Act 697, § 5; O.C.G.A. § 21-2-230(b).

[5] Plaintiffs do not even suggest that they have suffered any particularized injury as a result of Count II's allegations that Georgia law fails to satisfy the NVRA—even though Plaintiffs amended their lawsuit to include this claim.

grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (quoting *Spokeo v. Robins*, 578 U.S. 330, 340 (2016)). In other words, even if Plaintiffs do have a private right of action under the NVRA, they still must allege a cognizable injury-in-fact—something that their Amended Complaint fails to do. *See, e.g.*, *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (dismissing properly noticed claim under NVRA because organization failed to demonstrate injury-in-fact); *cf. Georgia State Conf. of NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1336 (N.D. Ga. 2012) (finding organization had standing to bring properly noticed NVRA claim only after finding it established Article III standing).

Because Plaintiffs have alleged no cognizable injury sufficient to satisfy the demands of Article III as to any of their claims for relief, the Complaint should be dismissed in its entirety.

## II.     Plaintiffs fail to state a claim under the NVRA.

To survive a 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausibility is the key, as the well-pled allegations must nudge the claim across the line from conceivable to plausible." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (internal quotations omitted). "Naked assertions devoid of further factual

enhancement" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678 (cleaned up).

### A. Plaintiffs' list maintenance project does not reveal any NVRA violations.

Plaintiffs assert that the Secretary has violated the NVRA by failing "to correct . . . registrations," but they ignore their own data which makes clear that election officials, including the Secretary, are in fact conducting ongoing list maintenance even beyond what the NVRA requires.

Plaintiffs' only basis for challenging Georgia's process as inadequate is their belief that they have "identified many voters who apparently have moved out of the jurisdiction in which they are registered but are nonetheless included on Georgia's active voter lists." Am. Compl. ¶¶ 25, 48. In other words, Plaintiffs conducted their own list maintenance experiment and the results varied to some degree from that of the State, and they ask this Court to assume that the difference proves the State's program is not just inferior but unlawful.

It is Plaintiffs' process, however, that is flawed. They identified voters who "checked on the USPS Official Mail Forwarding Change of Address form that their move was permanent," Am. Compl. ¶ 22, but seem unaware of the fact that many categories of voters including "people in the military and students away at college or university" use the permanent designation even though they are "still eligible to

vote at their prior address." *Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1270 (N.D. Ga. 2024); *see also* O.C.G.A. § 21-2-230(b)(2) (rendering exclusively NCOA-based challenges to such voters "insufficient"). This Court recently found a similar process to "utterly lack[] reliability" to the point that it "verge[d] on recklessness." *Fair Fight Inc.*, 710 F. Supp. 3d at 1274.

Plaintiffs offer additional data in their Amended Complaint, but it only undermines their allegations. When Plaintiffs first conducted their experiment using voter roll data from June 2024, they purportedly identified 2,029 voters in Cherokee County who had marked the "permanent" box on a change of address form and were still marked "active" in the voter rolls. But when Plaintiffs ran the experiment again using data from October 2024, only 698 of those voters were still active. Am. Compl. ¶ 41. In other words, ongoing voter roll maintenance had already resulted in the reclassification of 1,331 (roughly two-thirds) of the voters with whom Plaintiffs were concerned. The same is true in Forsyth County, where officials were equally efficient in removing 1,134 of 1,722 voters that Plaintiffs claimed to have identified. *Id.* ¶ 42.

Plaintiffs ignore obvious explanations for differences between their list and that of election officials. They *assume* that the voters they identified as remaining on the list of active voters *must* have relocated and that no verification has taken place. This is rank speculation. It is entirely possible that those voters were mailed a

notice and returned it, confirming their addresses. *See* O.C.G.A. § 21-2-233(c) ("If the elector responds to the notice and affirms that the elector has not moved, the elector shall remain on the list of electors").[6] It is similarly possible that voters who were once on the inactive list subsequently signed a petition or voted in person, both of which would have reactivated their active statuses. O.C.G.A. §§ 21-2-235 (a), (d). It also is not at all surprising that there would be differences between Plaintiffs' process and that used by state officials: If Plaintiffs used either a list of voters or an NCOA database that were generated on different days than those used by the state, for example, one would expect differences in the contents of each. Likewise, if Plaintiffs relied on lower matching standards—something that is indeterminable based on their inscrutable description—one would expect differing results.

Even if Plaintiffs had plausibly alleged that any of the identified voters were ineligible to vote, Plaintiffs still fail to recognize that the NVRA itself contemplates that there will be more registered voters than eligible voters at any given time because the statute prohibits immediate removal of voters except in very specific scenarios. *PILF*, 721 F. Supp. 3d at 596 ("The NVRA does not require states to immediately remove every voter who may have become ineligible."). Plaintiffs

---

[6] In their first Complaint, Plaintiffs admit that Georgia may have sent notices to "some or all of the voters identified" by Plaintiffs—which, if true, would mean that the state had satisfied the NVRA even under Plaintiffs' incorrect interpretation of the law. Compl. ¶ 39.

further ignore that the statute uses the term "reasonable," a prescriptive choice that indicates that the law "confers broad discretion on the States to adopt [their own] standards." *Beal v. Doe*, 432 U.S. 438, 444 (1977); *see also, e.g.*, *PILF*, 721 F. Supp. 3d at 595 (explaining that "Congress did not establish a specific program for states to follow for removing ineligible voters"); *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019) ("[T]he statute requires nothing more of the state."). Under the NVRA there is nothing "unreasonable" about having what looks like a surplus number of voters on the rolls at one moment in time.

### B. Plaintiffs have not identified any conflict between the NVRA and the list maintenance procedures prescribed by Georgia law.

Plaintiffs take issue with the General Assembly's decision to require list maintenance at the Secretary's "discretion" and seem to argue that the state must set *in statute* a schedule for matching NCOA data, but that requirement appears nowhere in the NVRA. Am. Compl. ¶¶ 38, 59–63. In support of this proposition, Plaintiffs offer two statutes *from other states*, *see* Am. Compl. ¶ 38, but these examples prove nothing, as many other states beyond the two examples Plaintiffs cite have no such schedule whatsoever. *See, e.g.*, Ky. Rev. Stat. § 116.112(1) (providing no set schedule for voter roll maintenance, reserving timeline for list maintenance to the State Board of Elections' discretion); Iowa Code § 48A.28(2.a) (leaving timing of maintenance to the discretion of state voter registration commission); *see also*

Arkansas Laws 2023, Act 441, § 2 (similar).[7] The NVRA itself does not mandate such procedures either; it offers NCOA-based address verification as a "safe harbor"—an example of a process that will satisfy a state's obligation—but does not establish a specific program for states to follow for removing ineligible voters.[8] *See* 52 U.S.C. § 20507(c); *see also Republican Nat'l Comm. v. Benson*, No. 1:24-CV-262, 2024 WL 4539309, *13 (W.D. Mich. Oct. 22, 2024).

Unable to locate any statutory language to support their proposed NCOA mandate, Plaintiffs accuse the Secretary of disclaiming any duty to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters." Am. Compl. ¶¶ 56–57. But the Secretary made no such claim, nor could he under Georgia law. Rather, the Secretary explained that Georgia's statute vests him with authority to determine "whether and when to perform a comparison of the voter rolls *to the NCOA database*," but an NCOA program is only one method for maintaining voter rolls. Br. in Supp. of Mot. to Dismiss at 14, ECF No. 30-1 (emphasis added). While Plaintiffs overread the Secretary's summation of O.C.G.A. § 21-2-233, they ignore O.C.G.A. § 21-2-210, which explicitly requires the Secretary to "coordinate the responsibilities of [Georgia] under the National Voter

---

[7] Indeed, Arkansas does not even require the use of NCOA data as part of the state's list maintenance program. Arkansas Laws 2023 Act 441, § 3.

[8] For this same reason, Plaintiffs' assertion that the Secretary's program "does not satisfy the safe harbor provision of the NVRA" lacks merit; the safe harbor is not a requirement. Am. Compl. ¶¶ 49, 59.

Registration Act of 1993," and O.C.G.A. § 21-2-235, which requires the Secretary to "maintain an inactive list of electors" and to remove those voters after a waiting period has elapsed. There is no need for the legislature to "redraft O.C.G.A. § 21-2-233 to comply with the requirements of the NVRA," Am. Compl. at ¶ 63, because a full reading of the election code makes clear that the Secretary is *already* statutorily required to conduct an NVRA-compliant maintenance program. Count II improperly conflates the Secretary's NCOA-matching discretion with his non-discretionary, statutory obligation to coordinate and execute a general statewide maintenance program. For this reason, it fails.

In sum, Plaintiffs cannot dispute that voter roll maintenance is ongoing in Georgia; the crux of their claim is their belief that this maintenance is not happening fast enough. But their "mere opinion on the topic" does not establish a right to relief, nor does it "demonstrate that [the state's] timing on removing" voters is not "reasonable," which is all that the NVRA requires. *PILF*, 721 F. Supp. 3d at 596. The Amended Complaint thus fails to state a cognizable claim.

## CONCLUSION

Plaintiffs lack standing and have failed to plead a violation of federal law. For these reasons (and those discussed in more detail above), Black Voters Matter Fund respectfully requests that the Court grant its motion to dismiss all counts.

Dated: December 9, 2024

Respectfully submitted,

**/s/ Adam M. Sparks**
Adam M. Sparks
Ga. Bar No. 341578
Anré D. Washington
Ga. Bar No. 351623
**KREVOLIN & HORST, LLC**
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3500
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: sparks@khlawfirm.com
Email: washington@khlawfirm.com

Uzoma N. Nkwonta**
Marcos Mocine-McQueen**
Renata M. O'Donnell*
James J. Pinchak*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue, Suite 400
Washington, D.C. 20001
(202) 968-4490
unkwonta@elias.law
mmcqueen@elias.law
rodonnell@elias.law
jpinchak@elias.law

Tyler L. Bishop**
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(202) 985-0628
tbishop@elias.law

*Counsel for Proposed Intervenor-
Defendant Black Voters Matter Fund*

*Pro Hac Vice Application Forthcoming*
***Admitted Pro Hac Vice**

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, NDGa, the undersigned counsel hereby certifies that the foregoing document complies with the font and point selections approved by the Court in Local Rule 5.1C, NDGa. This document was prepared on a computer using Times New Roman font (14 point).

This 9th day of December 2024.

**/s/ Adam M. Sparks**
Adam M. Sparks

*Counsel for Proposed Intervenor-Defendant Black Voters Matter Fund*